**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANDRE STEVENS, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 99-1918 |
| | ) | |
| v. | ) | |
| | ) | Judge Arthur J. Schwab |
| JEFFREY A. BEARD, Secretary, | ) | |
| Pennsylvania Department of Corrections, | ) | |
| LOIS S. FOLINO, Superintendent, | ) | |
| SCI Greene, FRANKLIN J. TENNIS, | ) | |
| Superintendent, SCI Rockview | ) | |
| | ) | |
| Respondents.[1] | ) | |

**O P I N I O N**

## I.   INTRODUCTION

In the early morning hour of February 8, 1992, Petitioner Andre Stevens shot and killed his estranged wife, Brenda Jo Stevens, age 45, and Mike Love, age 28, at Armando's Bar in Beaver County, Pennsylvania.  Stevens and Brenda Jo were divorcing and they had arrived at the bar separately.  He became enraged when he saw her dancing near Love and he went outside to his car and retrieved a loaded nine-millimeter semi-automatic pistol.  When he came back into the crowded establishment, he approached the dance floor and opened fire on the victims.  He shot Brenda Jo at close range in the back of the head, killing her.  He then turned and shot Love multiple times in different parts of the body.  Several of Love's wounds were defensive in nature, inflicted when he raised his arms to deflect the attack.  After a brief pause, Stevens fired a final

---

[1]  Because the original Respondents have been succeeded by Beard, Folino, and Tennis, respectively, they have been substituted as the named Respondents by operation of law. Fed.R.Civ.P. 25(d).

shot into Love's groin area and stated "you'll f---- no more."  Love died as a result of the many injuries he sustained.

Stevens waived his right to a jury trial as to his guilt.  On April 21, 1993, the trial court (the Honorable Robert E. Kunselman of the Court of Common Pleas of Beaver County) convicted him on the two counts of first-degree murder.  A jury was empaneled for a separate penalty hearing, at the conclusion of which Stevens was sentenced to death on each conviction.

As discussed in more detail below, Stevens' first-degree murder convictions are not at issue at the present time.  In 2004, I issued a decision in which I denied his single habeas guilt-phase claim, which was that his counsel was ineffective for failing to develop and present evidence of his alleged diminished capacity as a defense to the charges of first-degree murder. Stevens v. Beard, 319 F.Supp.2d 592 (W.D. Pa. 1994).  In that same decision, I granted Stevens a writ of habeas corpus on his claim that he is entitled to a new sentencing hearing because the trial court improperly excluded a prospective juror for cause based upon her general objection to the death penalty (Claim VII).[2]  The United States Court of Appeals for the Third Circuit affirmed, Stevens v. Horn, 187 F.App'x. 205 (3d Cir. 2006) (non-precedential) but the Supreme Court of the United States vacated its decision with respect to Claim VII and remanded for reconsideration in light of a recent decision issued by it.  The Court of Appeals has in turn remanded the case back to this Court to reconsider Claim VII and, if need be, all of Stevens' sentencing-phase claims.

_____

[2]  My disposition of Claim VII and the conclusion that a writ of habeas corpus be issued with respect to the death sentences rendered it unnecessary for me to address Stevens' remaining sentencing-phase claims at that time, as any relief he could have obtained on those claims would have been cumulative.

Thus, currently pending are Stevens' habeas claims filed pursuant to 28 U.S.C. § 2254 challenging his sentences of death. He contends they were obtained in violation of his federal constitutional rights and as relief seeks a new sentencing hearing. In support, he raises the following fourteen claims, which include numerous sub-claims:

**Claim I**    His lead trial counsel, Wayne S. Lipecky, Esq., was ineffective for failing to investigate and present available mitigating evidence at the sentencing hearing;

**Claim II**    The second panel of prospective jurors was selected improperly;

**Claim III**    The Pennsylvania Supreme Court failed to provide him meaningful proportionality review on direct appeal a mandated by 42 PA.CONS.STAT. § 9711(H)(3)(III);

**Claim IV**    The trial court's instruction concerning the aggravating circumstance of torture (42 PA.CONS.STAT. § 9711(d)(8)) was unconstitutionally vague; in addition, the evidence was insufficient to establish that aggravating circumstance;

**Claim V**    The trial court's instruction concerning the aggravating circumstance of "created a grave risk of death to another in addition to the victim" (42 PA.CONS.STAT. § 9711(d)(7)) was unconstitutionally vague;

**Claim VI**    The aggravating circumstances of "created a grave risk of death to another in addition to the victim" and "convicted of another murder" (42 PA.CONS.STAT. §§ 9711(d)(7) & (11)) impermissibly double counted the same aggravating evidence;

**Claim VII**    The jury was not properly death qualified or life qualified;

**Claim VIII**    The trial court erred in deny his motion for a change of venue or venire;

**Claim IX**    The Commonwealth introduced prejudicial, improper evidence about his relationships with other women;

**Claim X**    The trial court's instructions violated the constitutional mandate that the prosecution prove beyond a reasonable doubt every element of every aggravating circumstance;

**Claim XI**    The Commonwealth improperly introduced evidence and argument concerning invalid non-statutory aggravating factors, and the jury improperly considered such

3

evidence and argument;

**Claim XII**    The trial court failed to instruct the jury properly on the nature and use of mitigating factors;

**Claim XIII**   The trial court erred in permitting the Commonwealth to introduce the testimony of a forensic pathologist to discuss Brenda Jo's injuries and cause of death;

**Claim XIV**    The trial court failed to accurately instruct the jury on his parole ineligibility.

After careful consideration, I conclude that Stevens is not entitled to habeas relief on Claim VII or on any of his other sentencing-phase claims, and I therefore deny his petition for writ of habeas corpus.

## II.    RELEVANT PROCEDURAL BACKGROUND[3]

After his arrest, Stevens retained Wendell Freeland, Esq., as his defense counsel.  He represented Stevens for approximately nine months and then withdrew in November 1992.  The trial court appointed the Beaver County Public Defender's office to replace Freeland and Wayne S. Lipecky, Esq., assisted by Thomas C. Phillis, Esq., assumed representation.  They represented Stevens through his trial, and Lipecky continued as counsel on the direct appeal.

As set forth above, Stevens waived his right to a jury trial as to his guilt.  On April 21, 1993, the trial court convicted him of two counts of first-degree murder.  Jury selection for the sentencing hearing took place over the next three weekdays and the actual hearing commenced

---

[3]  The state court record submitted by the Commonwealth is very poorly organized.  The transcripts are scattered among many different appendices and are often in no apparent order.  For the sake of simplicity, when possible I cite to testimony by just referencing the appendix at which the transcript is located.  However, some appendices contain more than one transcript.  When I must cite to transcript contained in those appendices, I cite to the appendix number and also include the date of the transcript.  Finally, part of the transcripts for proceedings conducted on April 28-29, 1993, are not located at any appendix, but are contained loosely in the Clerk's Office folder for this case.  I cite to the testimony from those transcripts by date.

on Tuesday, April 27, 1993.

At the hearing, the Commonwealth had the burden of proving beyond a reasonable doubt that at least one statutorily-defined aggravating circumstance accompanied the murder. Stevens could introduce, and the jury could consider, mitigating evidence. Mitigating circumstances had to be proved by a preponderance of the evidence. The jury could impose the death penalty only if it found that the statutorily-defined aggravating circumstances proven by the Commonwealth outweighed any mitigating circumstances proven by Stevens. See 42 PA.CONS.STAT. § 9711.

The Commonwealth pursued the following two aggravating circumstances regarding the sentence to be imposed for the murder of Brenda Jo: (1) while in the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim, id. § 9711(d)(7); and (2) the defendant has been convicted of another murder committed either before or at the time of the offense at issue, id. § 9711(d)(11). Regarding the sentence to be imposed for the murder of Love, the Commonwealth pursued those two aggravating circumstances, as well as the third aggravator that the offense was committed by means of torture, id. § 9711(d)(8).

Stevens relied upon the following mitigating circumstances: (1) he had no significant history of prior criminal convictions, id. § 9711(e)(1); (2) he was under the influence of extreme mental or emotional disturbance, id. § 9711(e)(2); and (3) any other evidence of mitigation concerning his character and his record or the circumstances of the offense, id. § 9711(e)(8) (commonly referred to as the "catch all" mitigating factor).[4] In its verdict, the jury found that

_____

[4] Defense counsel requested that the jury be instructed on a fourth mitigating circumstance: that Stevens' "capacity ... to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." 42

Stevens established the first two mitigating circumstances, but not the third.  It found that the Commonwealth proved all of the aggravating circumstances outlined above.  With respect to each murder, it found that the aggravating circumstances outweighed the mitigating circumstances and Stevens was sentence to death.

Following his trial, Stevens filed post-trial motions, which were denied by the Court of Common Pleas *en banc*.  (Dkt 15, App. 11, <u>Commonwealth v. Stevens</u>, Docket No. 365A of 1992, slip op. (C.P. Beaver Oct. 21, 1994) ("*Opinion Denying Post-Trial Motions*")).  In his direct appeal to the Pennsylvania Supreme Court, Stevens raised, in relevant part, Claim VIII[5] (challenging the trial court's denial of his motion for change of venue or venire), as well as the part of Claim IV challenging the sufficiency of the evidence of the aggravating circumstance of torture.  On January 18, 1996, the Pennsylvania Supreme Court, in a unanimous decision, affirmed Stevens' judgments of sentence.  <u>Commonwealth v. Stevens</u>, 670 A.2d 623 (Pa. 1996) ("<u>Stevens I</u>").  It denied Claims VIII and IV on the merits.  <u>Id.</u> at 625-28.  The Supreme Court of the United States denied Stevens' petition for writ of certiorari on October 7, 1996.  <u>Stevens v. Pennsylvania</u>, 519 U.S. 855 (1996).

Upon the conclusion of his direct appeal, Stevens filed a *pro se* petition with the Court of Common Pleas seeking collateral relief under the Pennsylvania Post-Conviction Relief Act ("PCRA").  The PCRA Court (Judge Kunselman) appointed Stevens' present counsel to represent

---

PA.CONS.STAT. § 9711(e)(3).  The court denied that request because one of the defense experts, Christine Martone, M.D., testified that Stevens had understood when he was killing the victims that what he was doing was wrong, and also that he had been able conform his conduct to the law.  (4/28/93 Trial Tr. at 67).

[5]  When discussing the claims Stevens raised in the state court, I identify them by referring to the number designated to them in this proceeding.

him.  In March 1997, Stevens, through his new counsel, filed an amended petition for PCRA relief, in which he raised the rest of the claims at issue in this proceeding almost verbatim (Claims I through VII and Claims IX through XIV).  (See Dkt. 15, App. 16).  The PCRA Court granted Stevens' request for an evidentiary hearing on Claim I and Claim III, and the hearing was conducted on January 26 through January 29, 1998.  (See Dkt. 16, Apps. 17-24).

Following the hearing, the PCRA Court issued a 95-page decision denying Stevens relief on all claims.  (Dkt. 17, App. 26, Commonwealth v. Stevens, Docket No. 365A of 1992, slip op. (C.P. Beaver July 1, 1998) ("*PCRA Court Opinion*")).  Stevens appealed to the Pennsylvania Supreme Court.  In a five to two decision, the court affirmed.  Commonwealth v. Stevens, 739 A.2d 507 (Pa. 1999) ("Stevens II").  It denied each of Stevens' claims on the merits except for Claim XIV, which it reject under a state-law rule regarding the retroactive application of new law.[6]

After the Pennsylvania Supreme Court issued its decision, Stevens filed a Petition for Writ of Habeas Corpus (Dkt. 7) with this Court.[7]  (See also *Memorandum Of Law In Support Of Petition*, Dkt. 19).  In addition to the fourteen sentencing-phase claims outlined above, Stevens also raised one claim, as part of Claim I, challenging the guilt-phase of his trial.  In that claim, he contended that he was entitled to a new trial as to his convictions because Lipecky was

_____

[6]  In its review of many of Stevens' claims, the Pennsylvania Supreme Court rejected the underlying substantive constitutional claim as part of its analysis of whether counsel was ineffective for failing to raise that claim.

[7]  Stevens' petition was originally assigned to the Honorable Donald J. Lee.  It was assigned to me upon Judge Lee's retirement.  Before I issued my first decision in this case in 2004, I directed that the Commonwealth supplement incomplete portions of the state court record (see Dkts. 30-32) and that the parties file supplemental legal briefs (see Dkts. 26 & 29).

ineffective for failing to investigate and present a diminished capacity defense to the charge of first-degree murder.  In its *Response* (Dkt 12), the Commonwealth contended that each of Stevens' habeas claims should be denied.

On May 26, 2004, I issued a decision denying Stevens' single guilt-phase claim and granting him sentencing-phase relief on his claim, raised as part of Claim VII, that a prospective juror was improperly excluded under Witherspoon v. Illinois, 391 U.S. 510 (1968).  Stevens v. Beard, 319 F.Supp.2d 592 (W.D. Pa. 1994) ("Stevens III").  Because I granted Stevens sentencing relief on his Witherspoon claim, his remaining sentencing claims were moot and were not addressed.

Stevens filed an appeal with the Court of Appeals challenging the denial of his guilt-phase claim.  The Commonwealth cross-appealed, challenging the relief granted on the Witherspoon claim.  On July 7, 2006, the Court of Appeals affirmed the judgment of this Court in all respects.  Stevens v. Horn, 187 F.App'x. 205 (3d Cir. 2006) ("Stevens IV").

Each side sought review in the Supreme Court.  The Commonwealth's petition for writ of certiorari was successful.  The Supreme Court vacated the Court of Appeals' decision in Stevens IV with respect to the Witherspoon claim and remanded for further consideration in light of it recent decision in Uttecht v. Brown, 551 U.S. 1 (2007).  Beard v. Stevens, 551 U.S. 1111 (2007).  In Uttecht, the Supreme Court held that the United States Court of Appeals for the Ninth Circuit had erred in granting a state prisoner federal habeas relief on a Witherspoon claim.

On July 25, 2008, the Court of Appeals issued a decision in which it reinstated the portion of its original opinion and judgment that rejected Stevens' guilt-phase claim.  Stevens v. Beard, 288 F.App'x. 4 (3d Cir. 2008) ("Stevens V").  It remanded Stevens' Witherspoon claim,

concluding that it "is best addressed anew by the District Court in the first instance[,]" and emphasizing that it was "fully committing the remanded proceedings to the sound discretion of the District Court." Id. at 6.

Immediately after the Court of Appeals issued its mandate, I issued a scheduling order directing that Stevens file an updated memorandum of law addressing all of his sentencing-phase claims on or before October 20, 2008.  (Dkt. 43).  Stevens' counsel requested five extensions.  On June, 4, 2009, the *Updated Memorandum Of Law* was filed.  (Dkt. 54).  The Commonwealth then filed its *Updated Answer* (Dkt. 61), to which Stevens filed a *Reply Brief* (Dkt. 64).  On February 16, 2010, Stevens filed a *Letter Brief Discussing Supplemental Authority* (Dkt. 66).

## III.   STANDARD OF REVIEW

Stevens' petition is governed by the federal habeas statute applicable to state prisoners, 28 U.S.C.§ 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA").  Under that statute, habeas relief is only available on the grounds that Stevens' sentences of death were obtained in violation of his federal constitutional rights.  28 U.S.C. § 2254(a).  Errors of state law are not cognizable.  See, e.g., Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)).[8]

---

[8] "A federal court may re-examine a state court's interpretation of its own law *only where this interpretation 'appears to be an obvious subterfuge to evade consideration of a federal issue*[.]" Real v. Superintendent Shannon, Docket No. 07-4532, — F.3d — , 2010 WL 715431 *6 (3d Cir. Mar. 3, 2010) (emphasis added) (quoting Hallowell v. Keve, 555 F.2d 103, 107 (3d Cir. 1977) (internal citations and quotation marks omitted)).

In describing the role of federal habeas proceedings, the Supreme Court, in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials.

Subsequent to that admonition, Congress enacted AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).  It "requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations."  <u>Lambert v. Blackwell</u>, 387 F.3d 210, 234 (3d Cir. 2004); <u>see also</u> <u>Lewis v. Horn</u>, 581 F.3d 92, 109-18 (3d Cir. 2009).

As codified at 28 U.S.C. § 2254(d), AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits in State court proceedings* unless the adjudication of the claim–
>
> (1) resulted in a decision that was *contrary to,[9] or involved an unreasonable application of,[10] clearly established Federal law*, as determined by the Supreme

---

[9]  "A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'"  <u>Lambert</u>, 387 F.3d at 234 (quoting <u>Terry Williams</u>, 529 U.S. at 405-06).  <u>See also</u> <u>Real</u>, No. 07-4532, — F.3d — , 2010 WL 715431, * 4.

[10]  "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context

Court of the United States; or

(2) resulted in a decision that was based on an *unreasonable determination of the facts in light of the evidence presented in the State court proceeding*.

(Emphasis added). Thus, AEDPA circumscribes a federal habeas court's review of a state prisoner's constitutional claims when the state court already has "adjudicated on the merits" and denied those claims. "[F]or the purposes of [§ ] 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground." Brian Thomas v. Horn, 570 F.3d 105, 117 (3d Cir. 2009), *cert. denied sub nom.* Docket No. 09-6823, — S.Ct. — , 2010 WL 1006029 (Mar. 22, 2010).

In his *Updated Memorandum Of Law* (Dkt. 54), Stevens acknowledges that, with the exception of Claim XIV, the Pennsylvania Supreme Court "adjudicated the merits" of each of his federal habeas claims in either Stevens I or Stevens II. He admits that my review of each of his claims, except for Claim XIV, is governed by AEDPA's deferential standard of review at § 2254(d).

Therefore, only Claim XIV will be reviewed *de novo*. See, e.g., Brian Thomas, 570 F.3d at 124 (when the state court has not "adjudicated a claim on the merits," the federal habeas court applies *de novo* review to the claim). With respect to all of Stevens' other claims, I may grant habeas relief only if he shows that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision

---

where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Id. (quoting Terry Williams, 529 U.S. at 407).

that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In applying this standard, I am reminded that under AEDPA, federal courts "are not authorized to grant habeas corpus relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices."  Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000).  It is not sufficient for Stevens to show that the state court's adjudication of any of his claims was an "incorrect or erroneous" application of Supreme Court precedent.  Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Instead, he must show that the state court's adjudication "cannot reasonably be justified under existing Supreme Court precedent."  Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004) (citations omitted); Knowles v. Mirzayance, — U.S. — ,129 S.Ct. 1411, 1420 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold")); Waddington v. Sarausad, — U.S. — , 129 S.Ct. 823, 831 (2009) (where it is the state court's application of governing federal law that is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted).

Finally, factual determinations made by the state court are also given considerable deference under AEDPA.  Within § 2254(d)(2)'s overarching standard, a petitioner may attack specific factual determinations that are subsidiary to the ultimate decision under § 2254(e)(1),[11]

---

[11]  Section 2254(e)(1) applies to all factual determinations made by the state courts, regardless of whether a state court has "adjudicated on the merits" a claim for the purposes of § 2254(d).  See, e.g., Lewis, 581 F.3d at 100 (citing Fahy v. Horn, 516 F.3d 169, 181 (3d Cir. 2008)).

which provides that "a determination of a factual issue made by a State court shall be presumed

to be correct.  The [petitioner] shall have the burden of rebutting the presumption of correctness

by clear and convincing evidence."  See Lambert, 387 F.3d at 235-39; Lewis, 581 F.3d at 111.


### IV.    REQUEST FOR AN EVIDENTIARY HEARING

Before turning to the merits of Stevens' claims, I first must address his request for an

evidentiary hearing.  To properly consider his request, a review of his earlier efforts to develop

the record is necessary.

### A.

In Stevens' amended *PCRA Petition*, he raised all of the claims that he raises in the instant

federal habeas petition, except for the two claims that he had already litigated on direct appeal

(Claim VIII, which challenged the trial court's denial of his request to change the venue or venire,

and the part of Claim IV that challenged the sufficiency of the evidence of Love's torture).  At the

end of the amended *PCRA Petition*, Stevens made a broad request for an evidentiary hearing on

all claims and all disputed issues of fact.  (Dkt. 15, App. 16 at 129-32).

Stevens attached to the amended *PCRA Petition* exhibits relevant to Claim I (ineffective

assistance for failing to develop diminished capacity and mitigation evidence) and Claim III

(challenging the Pennsylvania Supreme Court's proportionality review process).  On July 22,

1997, the PCRA Court granted Stevens' request for an evidentiary hearing on those two claims as

they were the "claims as to which the court concludes that factual issues need to be resolved[.]"

(Dkt. 63).  The PCRA Court determined that no evidentiary hearing was needed on Stevens'

remaining claims because they did not raise issues of disputed fact and could be resolved by

examination of the existing record.  (Id.)

The PCRA Court held a four-day evidentiary hearing on January 26 through 29, 1998, at which the following twelve witnesses testified:  (1) Ralph Landefeld, Ph.D., the psychologist who had performed testing on Stevens prior to his trial and who had testified as a defense witness at the sentencing hearing; (2) Christine A. Martone, M.D., the psychiatrists who had examined Stevens prior to his trial for competency and prior to his sentencing for mitigation, and who had testified as a defense witness at the sentencing hearing; (3) Rodney Altman, D.O., the other psychiatrist who had examined Stevens prior to his trial and sentencing and who had testified as a defense witness at the sentencing hearing; (4) Carol Armstrong, Ph.D., a neuropsychologist who had evaluated Stevens in 1997 to support his PCRA claims; (5)  Lawson F. Bernstein, M.D., a psychiatrist who had examined Stevens in 1997 to support his PCRA claims; (6) Stevens' trial attorneys Lipecky, and (7) Phillis; (8) his first attorney, Freeland; (9) his sisters, Rosmary Postich and (10) Constance Corbitt; (11) his daughter, Karen Stevens Mangerie, who had testified as a defense witness at the sentencing hearing; and (12) Eugene P. Ericksen, Ph.D., an expert in statistics who testified about the Pennsylvania Supreme Court's proportionality review process. (See Dkt. 16, Apps. 17-24; see also PCRA Hr'g Exs. at Dkt. 30, App. 1 and Dkt. 32).

In its opinion denying post-conviction relief, the PCRA Court reiterated why it had denied Stevens' broad request for an evidentiary hearing on all claims:

> Upon review of [Stevens'] Amended Petition, it was apparent to the court that all of the issues, except for the two on which we granted a hearing, did not raise factual issues.  Rather, these involved matters of law and could be resolved by examining the relevant law and the transcript from the original proceedings in this case.  Most of the issues involved legal questions regarding the correctness or adequacy of the court's charge.  The claims of ineffective assistance of counsel related to those issues were likewise based upon the legal analysis of the

14

underlying issues, and as is evident from the above discussion, were meritless. Additionally, we found several of the issues to be completely frivolous, and consequently did not even grant argument on those matters.  See Order dated 7/27/97.  For these reasons, we properly denied [Stevens'] request for an evidentiary hearing on all issues raised in his Amended Petition.

(Dkt. 17, App. 26, *PCRA Court Opinion* at 94-95).[12]

When Stevens filed his habeas petition with this Court, he made a rote request for an evidentiary hearing "on all claims involving disputed issues of fact."  (Dkt. 7 at 94).  He did not identify specific claims that required further factual development or otherwise indicate what additional testimony or documents he wished to present to this Court.  Nowhere in his subsequently filed *Memorandum Of Law* (Dkt. 19) or *Supplemental Brief* (Dkt. 29), did Stevens contend that he was entitled to, or required, an evidentiary hearing.

After the Court of Appeals remanded this case, Stevens for the first time made a more specific request for an evidentiary hearing.  In his post-remand *Updated Memorandum Of Law* (Dkt. 54), he expressly requests a hearing on Claim I and the remanded Witherspoon claim at Claim VII.  With respect to his other claims, he repeats the boilerplate suggestion that an "evidentiary hearing may be necessary, if the Court does not grant relief based on the existing record."

**B.**

AEDPA, as codified at 28 U.S.C. § 2254(e)(2), limits the ability of a federal district court to hold an evidentiary hearing in habeas review.  See Michael Williams v. Taylor, 529 U.S. 420 (2000); Palmer v. Hendricks, 592 F.3d 386, 392-94  (3d Cir. 2010); Lewis, 581 F.3d at 104-05,

---

[12]  In his appeal to the Pennsylvania Supreme Court, Stevens did not challenge the PCRA Court's decision denying him a broader evidentiary hearing.  (See Dkt. 30, App. 3, *Initial Brief Of Appellant* and *Reply Brief Of Appellant*).

15

109 n.11, 117; Goldblum v. Klem, 510 F.3d 204, 220-21 (3d Cir. 2007), *cert. denied sub nom.*

129 S.Ct. 106 (2008); Taylor v. Horn, 504 F.3d 416, 435-37 (3d Cir. 2007), *cert. denied sub*

*nom.* 129 S.Ct. 92 (2008); Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006); Clayton Thomas

v. Varner, 428 F.3d 491, 497-99 (3d Cir. 2005).  Under AEDPA, if a state prisoner "has

developed the factual basis of his claims in the state court, he is not entitled to an evidentiary

hearing" in federal court.  Goldblum, 510 F.3d at 220 (citing 28 U.S.C. § 2254(e)(2)); Rolan, 445

F.3d at 680-81 (district court erred in conducting an evidentiary hearing on a claim when the

state court had conducted a hearing on the same issue); Taylor, 504 F.3d at 435-37 (petitioner not

entitled to evidentiary hearing in federal court when he could have presented his alleged new

evidence to the PCRA Court).  At the PCRA hearing, Stevens had the opportunity to develop,

and did develop, evidentiary support for the factual allegations raised in Claim I and Claim III.

For that reason, he is not entitled to a hearing on either of those claims in this Court.

  With regard to Stevens' remaining claims – including Claim VII (the Witherspoon claim)

– AEDPA provides that if the factual record *was not developed* in the state court proceeding, the

district court must consider whether the failure to develop the record is attributable to the

petitioner.  Brian Thomas v. Horn, 570 F.3d at 125-26;  Taylor, 504 F.3d at 435-37;  Clayton

Thomas, 428 F.3d at 498-99.  If the failure to develop the record *is attributable to the petitioner*,

AEDPA prohibits an evidentiary hearing in federal court.  28 U.S.C. § 2254(e)(2).  See, e.g.,

Lewis, 581 F.3d at 104-05 (citing Michael Williams, 529 U.S. at 435 (the purpose of

§ 2254(e)(2) is "to ensure the prisoner undertakes his own diligent search for evidence"); Taylor,

504 F.3d at 437 ("Federal courts sitting in habeas are not an alternative forum for trying facts and

issues which a prisoner made insufficient effort to pursue in state proceedings.")).  The Supreme

Court has explained that "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." <u>Michael Williams</u>, 529 U.S. at 432.

When the failure to develop the factual basis of a claim in the state court *is not attributable to the petitioner*, it is within the district court's discretion to grant an evidentiary hearing on a claim. <u>Schriro</u>, 550 U.S. at 473-75; <u>Palmer</u>, 592 F.3d at 393; <u>Lewis</u>, 581 F.3d at 117; <u>Rolan</u>, 445 F.3d at 680-81; <u>Clayton Thomas</u>, 428 F.3d at 497-98. In deciding whether to exercise that discretion, the district court "must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief" under AEDPA's standards of review. <u>Landrigan</u>, 550 U.S. at 474 (citation omitted); <u>see</u> <u>also</u> <u>Palmer</u>, 592 F.3d at 395 ("bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing" on a habeas petition).

Stevens contends that the failure to develop the record on Claim VII and his other claims cannot be attributed to him because he showed "diligence" by making a request for a hearing in his amended PCRA motion. The Supreme Court has held that "diligence" sufficient to over come AEDPA's prohibition on evidentiary hearings "will require in the usual case that the prisoner, *at a minimum* seek an evidentiary hearing in state court in the manner prescribed by state law[.]" <u>Michael Williams</u>, 529 U.S. at 437. However, if, as Stevens suggests, *all* that is required is to make the type of *broad, boilerplate request* that he made to the PCRA Court in this case, AEDPA's limitation on evidentiary hearings would be rendered meaningless. <u>See</u> <u>Lewis</u>, 581 F.3d at 104-05 (denying petitioner's request for a hearing on one of his habeas claims even though the state court had refused to grant him a hearing on that claim). In this case, the PCRA

Court held an extensive hearing on the two claims upon which Stevens proffered additional evidence and demonstrated issues of fact.  If he had advised the PCRA Court that he had evidence to support his other claims, as he did for Claim I and Claim III, there is reason to believe that the PCRA Court would have permitted him to introduce it.[13]

Based on all of the foregoing, I am not convinced by Stevens' position that he was diligent in attempting to develop the record in state court or that AEDPA does not prohibit this Court from conducting an evidentiary hearing.  However, even if I assume that the statutory bar does not apply, I would still, in an exercise of my discretion, deny Stevens' request.  That is because he has failed to direct this Court to any evidence that he would introduce at a hearing to support Claim VII or any of his other claims.  He has not submitted the affidavits of any witnesses he would call to testify or any documents that he would introduce.  He has not even informed this Court that Lipecky, Phillis, or any other witness would be available to testify.  Thus, he has failed to show that a hearing could enable him to prove the petition's factual allegations or that there are any genuine issues of disputed fact.  Id.[14]

Therefore, Stevens' request for an evidentiary hearing is denied.  Habeas review of his

---

[13]  Stevens does not contend that he was unable to investigate and develop information to present to the PCRA Court.

[14]  In Lewis, the state court denied the petitioner's request for an evidentiary hearing on his Batson claim.  In his federal habeas appeal, the Court of Appeals affirmed the district court's decision that § 2254(e)(2) barred a hearing in federal habeas.  Lewis, 581 F.3d at 104-05.  It noted: "Despite Lewis's repeated requests for an evidentiary hearing, he failed to make any efforts to provide reliable evidence in support of his Batson claim, such as by providing affidavits of the stricken venire members attesting to their race, obtaining voter registration cards identifying the stricken venire members' race, or submitting exhibits of Lewis's notes from jury selection, the notes of his counsel, or the notes of the prosecutor.  Because Lewis has not availed himself of these means of substantiating his allegations, we fail to see how an evidentiary hearing would be beneficial."  Id. at 104 n.7.

claims is limited to examining the record developed before the state court under the standards set forth in 28 U.S.C. § 2254(d) and (e)(1) (discussed *supra*).  Id.; Taylor, 504 F.3d at 435-37; Rolan, 445 F.3d at 678-81; Goldblum, 510 F.3d at 221.  See also Holland v. Jackson, 542 U.S. 649, 652 (2004) (per curiam) (citations omitted) ("[W]e have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the [state] court had before it.").

## V.   STEVENS' CLAIMS

**Claim I        Ineffective Assistance For Failing To Investigate and Present Available Mitigating Evidence At the Sentencing Hearing**

Stevens claims that his lead defense attorney, Lipecky, failed to conduct an adequate investigation into available mitigation evidence, in violation of his Sixth Amendment right to effective assistance of counsel.  Specifically, he faults counsel for failing to provide to the defense mental health experts, Dr. Altman, Dr. Landefeld, and Dr. Martone: (1) the 22-pages of handwritten notes (sometimes described as a journal), maintained by him prior to the murders, which was recovered by the police during a search of his residence, and which he claims demonstrated that he was psychotic at the time of the crimes;[15] (2) letters he had written to his first attorney, Freeland, that demonstrated paranoid and delusional thinking; (3) his complete military, employment, and school records; and (4) information from his daughter and two sisters

---

[15]    At the PCRA hearing, Stevens presented expert mental health evidence to support his contention that the journal reveals that at the time of the murders he was "szchizophrenic," disjointed," "under extreme emotional distress," "seriously mentally ill," "experiencing paranoid ideation," and was "psychotic."  (Dkt. 16, App. 17 at 24; App. 22 at 16; App. 24 at 33-34, 45, 49).

detailing his difficult childhood, medical history, and troubled life.

### A.

The "clearly established Federal law," 28 U.S.C. § 2254(d), for AEDPA purposes in which to analyze a claim of ineffective assistance is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Stevens first must show that Lipecky's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. at 687. The law presumes that counsel was effective:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689 (internal citations and quotations omitted).[16] Recognizing that the scope and intensity

---

[16] Two presumptions inform an objective reasonableness inquiry. Bullock v. Carver, 297 F.3d 1036, 1046 (10th Cir. 2002) (cited with approval in Clayton Thomas, 428 F.3d at 500). First, the court "must always start the analysis that an attorney acted in an objectively reasonable manner and that an attorney's challenged conduct might have been part of a sound trial strategy." Id. (emphasis in original). Second, "where it is shown that a particular decisions was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively unreasonable becomes 'virtually unchallengeable.'" Id. (quoting Strickland, 466 U.S. at 690). However, "it is important to remember that these presumptions are simply tools that assist us in analyzing Strickland's deficient performance prong and they do not, in and of themselves, answer the ultimate question, which is whether counsel performed in an objectively reasonable manner." Id. "So, for example, even though counsel's strategy was ill-informed and thus does not qualify for the virtually unchallengeable presumption of reasonableness, a court reviewing the record

of defense counsel's investigation and development of defenses differs with the facts of each

case, the Supreme Court in Strickland, "did not offer any special standards concerning the duty to

investigate[.]"  Stevens v. Delaware Corr. Ctr., 295 F.3d 361, 371 (3d Cir. 2002) (citing

Strickland, 466 U.S. at 691).  It did, however, state that in all cases, "counsel has a duty to make

reasonable investigations or to make a reasonable decision that makes particular investigations

unnecessary."  Id. (quoting Strickland, 466 U.S. at 691).  In assessing Lipecky's investigation, I

must conduct an objective review of his performance measured for reasonableness under

prevailing professional norms, including a context-dependent consideration of the challenged

conduct as seen from counsel's perspective at the time.  Wiggins, 539 U.S. at 522-27 (quoting

Strickland, 466 U.S. at 488-89) (internal quotations omitted); see also Bobby v. Van Hook, —

U.S. — , 130 S.Ct. 13, 16-20 (2009) (per curiam).  The Court of Appeals has explained that it is

"only the rare claim of ineffective assistance of counsel that should succeed under the properly

deferential standard to be applied in scrutinizing counsel's performance."  United States v.

Kauffman, 109 F.3d 186, 190 (3d Cir. 1997) (quoting United States v. Gray, 878 F.2d 702, 711

(3d Cir. 1989)).

    Strickland also requires Stevens to show that he was prejudiced by his the alleged

deficient performance.  "This requires showing that counsel's errors were so serious as to deprive

[him] of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687.  In other words,

Stevens "must show that there is a reasonable probability that, but for counsel's unprofessional

---

before it might still conclude that counsel performed in an objectively reasonable manner."  Id.
As the Supreme Court explained when discussing Strickland's first prong, "[t]he relevant
question is not whether counsel's choices were strategic, but whether they were reasonable."  Id.
at 1047-48 (quoting Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000)).

errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

As discussed below, the Pennsylvania Supreme Court denied Claim I because it determined that Stevens did not satisfy Strickland's first prong (it held that his performance was objectively reasonable).  Because it adjudicated Claim I on the merits, AEDPA's standard of review applies, as Stevens admits.  This standard adds another hurdle in addition to the already heavy burden he faces under Strickland.  See Knowles, 129 S.Ct. at 1420 (noting "the doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard.")

## B.

### 1.

In gathering information to prepare for the defense of his client, Stevens' first attorney, Freeland, spoke with his daughter, Karen.  (See Dkt. 16, App. 21 (Freeland Hr'g Test.) at 7-8). Freeland's notes reflect that Karen asked him if anyone was going to evaluate her father, because she thought he was "crazy."  (Id.; see also Dkt. 30, App. 1, PCRA Ex. AA).  In addition to his notes, Freeland's file also contained Stevens' 22-page journal; his partial military and employment records; and three letters that he had written to Freeland after the crimes.  (See Dkt. 30, App. 1, PCRA Exs. BB, CC, DD).

In August 1992, when Stevens was still represented by Freeland, the Commonwealth retained Dr. Martone for the purpose of evaluating him to determine if he was competent to stand trial.  (Trial Tr. 4/28/93 at 41).  Dr. Martone is a board certified psychiatrist and is the Director of the Allegheny County Behavior Clinic, which is a clinic for evaluating mentally ill offenders that

22

specializes in "the interface of law and psychiatry." (Id. at 39-40).

On August 24, 1992, Dr. Martone issued a four-page report.  (Dkt. 32, PCRA Ex. V).  In it, she reviewed Stevens' mental health history, his mental status pre- and post-arrest, and his early life history.  Dr. Martone determined that Stevens was competent to stand trial and that he was not psychotic.  She explained:

> *The defendant does not suffer from a psychotic disorder* and in my opinion there is no evidence that this defendant fulfills the criteria of the McNaught [sic] definition of not guilty by reason of insanity.  *He certainly was able to appreciate the nature and quality of his act and the wrongfulness of it.*  Concerning the issue of guilty but mentally ill, again, *the defendant is not now and was not at the time of the incident suffering from a psychotic disorder.*  He was preoccupied with his wife.  He was not able to accept the divorce and had certain personality disorder traits.  *However, he did not lack, in my opinion, the ability to appreciate the nature and quality of his act and the wrongfulness of it, nor was he unable to conform his behavior to the norms of society.*

(Id. (emphasis added)).

In November 1992, Freeland withdrew because Stevens lacked the personal funds to hire mental health experts, and the trial court appointed Lipecky and Phillis as defense counsel.  (Dkt. 16, App. 23 at 104-05).  When he took over Stevens' case, Lipecky met with Stevens and reviewed the materials contained in Freeland's files and Dr. Martone's report.  (Id. at 4, 104-09).  He also interviewed Karen, who described her parents' rocky marriage, said that Stevens seemed to her to be "out of touch," that he had lost a lot of weight in a short period of time, and that he obsessed about drugs and Brenda Jo's alleged infidelity.  (Id. at 9-11; Dkt. 32, PCRA Ex. FF).  Lipecky also interviewed Rosemary Postich, one of Stevens' sisters, about his family and his relationship with his wife.  (Id. at 125).

Lipecky's investigation indicated to him that Stevens had mental health issues that

required additional expert evaluation and he filed a motion for the appointment of a psychiatrist and psychologist to assist the defense.[17]  (Id. at 106-07, 126; see also Dkt. 31, App. 5).  On March 9, 1993, the trial court granted the motion and Lipecky retained Dr. Altman to conduct a mental-health examination of Stevens.  (Id. at 108-109).  Dr. Altman is certified by the American Osteopathic Board of Neurology and Psychiatry and belongs to numerous psychiatric associations.  He had previously been employed as the attending psychiatrist for the prison population of the Western Penitentiary, during which time he examined "hundreds" of criminal defendants. (Dkt. 15, App. 9 at 12-16).  Lipecky met with Dr. Altman several times.  (Dkt. 16, App. 23 at 115).

Dr. Altman conducted his initial examination of Stevens on March 29, 1993.  (Dkt. 15, App. 9 at 12; Dkt. 16, App. 24 at 4).  He informed Lipecky that Stevens was not psychotic – a diagnosis that was consistent with Dr. Martone's August 1992 assessment.  (Dkt. 16, App. 23 at 112, 116).  Dr. Altman wanted to conduct a second evaluation, and he and Lipecky met and reviewed the information Lipecky had about Stevens.  (Id.)

After this meeting, Dr. Altman arranged for Dr. Landefeld, a psychologist, to assist him in his evaluation of Stevens.  (Dkt. 16, App. 17 at 9).  At Dr. Altman's request, Dr. Landefeld performed a neuropsychological screening of Stevens, which included the administration of several tests, including the Minnesota Multiphasic Personality Inventory-2, the Rorschach Test, the Benton Test of Visual Retention, and the Trail Making Test.  (Id. at 10-12).  Dr. Altman had asked Dr. Landefeld to conduct this testing to "to determine or eliminate the possibility there

---

[17]  Lipecky reviewed Stevens' journal, and believed it reflected delusional thinking and perhaps contained evidence of psychosis.  (Dkt. 16, App. 23 at 25-26).

could be some neurological components contributing to the situation." (Dkt. 15, App. 9 at 6). Dr. Landefeld also conducted a clinical interview of Stevens, which he described at the sentencing hearing as "basically gathering information from the patient or client directly to find out his relating of the details of the story and what went on and from that point ... and really take a look at whether there is evidence of any psychotic types of processes, hallucinations or delusions, whether, you know, they are able to really relate[,] if they are alert, [if there are] psychomotor types of issues and then certain issues relating to depression, sleep, appetite types of issues that could give indication leaning towards diagnosis." (Id. at 7).

In his report, issued on or around April 9, 1993, Dr. Landefeld diagnosed Stevens as having an "Adjustment Reaction, with depressed mood" and "Paranoid Personality Disorder, with borderline and antisocial traits." (Dkt. 30, App. 1, PCRA Ex. H). Dr. Landefeld verbally informed Dr. Altman of the results of his testing, and then Dr. Altman examined Stevens for a second time. (Dkt. 16, App. 24 at 11; see also Dkt. 15, App. 9 at 17).

On April 15, 1993, Dr. Altman issued an eight-page report. (Dkt. 30, App.1, PCRA Ex. O). In it, he reviewed Stevens' background, including his education, military, and family history. (Id. at 1-7). Dr. Altman provided a detailed discussion of his examinations of Stevens and concluded:

> DISCUSSION AND FORMULATION:
>
> Mr. Stevens is an individual who has had a long history of emotional distrubance [sic] first recognized in his early teens while in the military and evidencing paranoid traits, schizoidal and isolative tendencies as well as possible overt psychosis. He has continued to have symptomatology within the same realm. Although a large gap from his teens until his mental health commitment in 1972 is lacking, he again in 1972 evidences paranoid and quasi delusional thinking as well as impulse discontrol.

25

CURRENT MENTAL STATUS EXAMINATION:

Evidences continuing paranoid ideation as a predominate feature with periods of projection and externalization onto others as plotting in some way against him.  He has difficulty in focus, continues to have tangential and circumstantial thought process and resultant difficulty in modulating his impulses when faced with either real or an imagined threatening situation.  Individuals such as Mr. Stevens can, at times of acute emotional turmoil, misperceive reality and can lack the ability to modulate their emotions with impulsive acting-out behavior.  His current ambivalence and apathy are secondary to being within a very structured and regimented environment, namely jail, but do not alleviate the continued core problem of *a relatively severe personality disorder consisting of paranoia, mood fluctuations, difficulties in judgment as well as rationalized disregard and retribution for and against others as a result of his continued paranoid personality*.

It is my opinion that given Mr. Stevens overall mental defects that when removed from a rigid and structured environment and placed under severe mental duress that he could decompensate and misperceive reality as well as act out impulsively in a manner perceived by him to protect his own well-being from the aggressions of either direct or indirect of others.

(Id. at 7-8 (emphasis added)).  Dr. Altman diagnosed Stevens as having Severe Adjustment

Disorder With Mixed Disturbance Of Emotions and Conduct, and Personality Disorder With

Paranoid Borderline and Antisocial Traits.  (Id. at 7).  He did not diagnose Stevens as being

psychotic, and he did not find evidence of the more serious mental health issues that he would

state Stevens had when he testified five years later at the 1998 PCRA hearing.

Lipecky prepared to have Dr. Altman and Dr. Landefeld testify at the sentencing hearing

in the event that the trial court found him guilty of first-degree murder.  He reviewed with

Dr. Altman his psychiatric assessment of Stevens and went over the capital sentencing statute

and the available mental health mitigating circumstances.  (Dkt. 16, App. 24 at 94).  He provided

Dr. Landefeld with a list of questions he would ask him during trial.  (Dkt. 16, App. 17 at 46).

Following the trial court's verdicts of guilt, Lipecky pursued additional expert mental

health assistance.  He contacted Dr. Martone, who had evaluated Stevens in August 1992 for

26

competency, because he believed that she could provide helpful expert mitigation testimony at the sentence hearing.  (Dkt. 16, App. 22 at 8; Dkt. 16, App. 23 at 19-20; see also Dkt. 30, App. 1, PCRA Ex. M).  Lipecky had several conversations with Dr. Martone and arranged for her to evaluate Stevens again for mitigation purposes.[18]  (Dkt. 16, App. 23 at 15-18, 22).

Dr. Martone evaluated Stevens on April 27, 1993, and she reached diagnoses similar to that which Dr. Altman had reached.  She concluded Stevens suffered from Adjustment Disorder with features of depression and Personality Disorder with explosive and paranoid features.  (Dkt. 20, App. 1, PCRA Ex. M).  She issued a three-page Addendum to her initial August 1992 report, explained that:

MENTAL STATUS EXAMINATION

The defendant was a well groomed white male who looked somewhat older than his stated age.  He was pleasant, polite and cooperative with the interview and oriented in all three spheres.  *His memory was intact.  His thoughts were logical and coherent and free of loosened associations.*  There was no evidence of hallucinations.  As before, there is some paranoid ideation, perhaps of delusional proportion.  He certainly is suspicions of his wife's fidelity and that may or may not be true.  He is beginning to doubt his delusional thinking concerning Mr. Love, but he still holds firm to the contention that his wife was unfaithful, abusing drugs and that she had sexually molested their daughter and would do so to their grandson.  He also gives a rather bizarre account of his wife telling him that she knew of a nurse that sexually molested female patients once they were anesthetized or prepared for anesthesia in the hospital.  It is his feeling that she was talking about herself.  This certainly sounds delusional.  His affect was almost tearful when talking about his wife and his actions.

- - -

RECOMMENDATION AND FORMULATION

. . . . [I]n my opinion, I do find sufficient evidence for mitigating circumstances in considering the death penalty.  To begin with, this man has a

---

[18]  After the guilt-phase of the trial concluded, Lipecky arranged to meet with Dr. Martone at her office, but she cancelled and they instead had a "long" phone conversation.  He also had spoken with her several times before the trial.  (Dkt. 16, App. 23 at 15, 21-22).

rigid, rather well entrenched, personality disorder with some fixed paranoid ideation and certainly a great deal of suspiciousness about his wife and other individuals involved with her.  He has demonstrated some explosive features. When he sustained this prolonged separation with divorce papers, he suffered from an adjustment disorder with features of depression of a moderately severe degree.  When suddenly confronted with his wife at the time of the incident, he found himself hoping again for some sort of communication or involvement with her.  When, instead, he saw her dancing with what he interpreted as a paramour, he reacted by shooting both of them.  In my opinion, within a reasonable degree of medical certainty, this would constitute mitigating circumstances when considering sentencing.

(Id. (emphasis added)).  Similar to Dr. Altman, she did not diagnose Stevens as being psychotic, and she did not find evidence of the more serious mental health issues that she would state Stevens had when she testified five years later at the 1998 PCRA hearing.

At the sentencing hearing, the Commonwealth presented the testimony of the investigating officers, the pathologist who had performed the autopsies on the victims, numerous patrons from Armando's Bar that had witnessed the shootings and the aftermath, and Brenda Jo's brother, Gary Luikart.

Stevens testified first to support his mitigation case.  He described his marriage to Brenda Jo and provided his version of the killings.  (4/28/93 Tr. at 2-38).  Dr. Martone testified next. She discussed in detail what she described as her two "full" evaluations of Stevens, which she explained consisted of a formal mental status examination and a narrative with him concerning the psychiatric symptoms he was suffering from when he committed the murders, his past psychiatric history, his early life history, his social history, as well as a review of his school and military records (which, she testified, showed that he previously had been diagnosed with schizoid personality disorder).  (Id. at 42-54, 57-60).  Importantly – considering Stevens' present allegations – Dr. Martone testified that she believed that the information Stevens gave her was

accurate and that he was a reliable self-historian.  (Id. at 44).  She expressly stated that her exams were sufficient to obtain the necessary information to render the opinion she was giving.  (Id. at 43).

At the conclusion of Dr. Martone's testimony, she testified that in her expert medical opinion, Stevens had a personality disorder mixed with prominent features of paranoia and that at the time of the murders he also suffered from an adjustment disorder because of the separation from his wife.  (Id. at 54-56).  She stated:

> [Stevens was] obsessed with his wife and fidelity or lack of it.… [H]e suffered weight loss, crying spells, increased alcohol abuse, and feelings of depression.… [W]hen he saw her with another man he, in his words [sic] he was like a time bomb.  He just exploded.  I think that between the life-long personality disorder, the alcohol abuse … the depressive symptomatlgy, there are mitigating circumstances evidence in my opinion in this situation.

(Id. at 61-62).

On cross-examination, Dr. Martone did acknowledge that, in her opinion, Stevens understood at the time of the killings that what he was doing was wrong.  She also said he had the ability to conform his behavior to normal societal standards.  (Id. at 67).

Next, the defense presented Dr. Landefeld.  He described the neuropsychological screening tests that he performed on Stevens.  (Dkt. 15, App. 9 at 7-8).  Dr. Altman then testified and described in detail his two psychiatric evaluations of Stevens.  (Id. at 19-44).  He explained that Stevens' medical records showed that he suffered from a chronic personality disorder that required life-long treatment of psychotherapy and medication management, which he had neglected to receive.  (Id. at 29-30).  He stated that Stevens had a personality disorder and borderline paranoia and that he was operating under severe psychosocial stressors at the time of

29

the murders which caused him to decompensate.  (Id. at 36-40).  Like Dr. Martone, Dr. Altman

testified that Stevens was a reliable self-historian.  (Id. at 20).

Karen Stevens testified about her parents' troubled relationship, her father's weight loss

after their separation, and stated that her father "would just talk out of his head.… He just would

say … things that I knew weren't true.  I didn't understand."  (4/28/93 Trial Tr. at 5).  Finally, the

defense presented the testimony of three of Stevens' co-workers and/or friends, Ralph Tooch,

Richard Kerlin, and Dwane Lipps, each of whom testified about his good character.  (Dkt. 15,

App. 9 at 45-55).

## 2.

That the jury was not persuaded by the defense mitigation case is, accordingly to Stevens,

Lipecky's fault.  He argues that Lipecky's investigation into available mitigating evidence fell

below that which is required by the Sixth Amendment.  He also contends that he was prejudiced

because, had Lipecky conducted a constitutionally sufficient investigation and provided the

defense experts with additional information, there is a reasonable probability that the jurors

would have placed more weight on the mitigating circumstance that one or more of them did find

(that he was under the influence of extreme mental or emotional disturbance, § 9711(e)(2)) and

also would have found the mitigating circumstances that he was under the influence of extreme

mental or emotional disturbance at the time of the murders, § 9711(e)(3), and the "catchall" at

§ 9711(e)(8)).

To support this claim, Stevens called Dr. Altman and Dr. Martone at the 1998 PCRA

hearing, and they, along with Dr. Landefeld, blamed Lipecky for failing to provide them with the

necessary information to make accurate diagnoses.  They substantially revised the testimony that

they had given at the 1993 sentencing hearing and stated that Stevens actually had much more

serious mental health issues than they had previously determined.[19]  Stevens also presented the

testimony of two additional mental health experts, Dr. Armstrong and Dr. Bernstein, in an effort

to show the type of mental health testimony that the defense could have offered at the sentencing

hearing had Lipecky performed effectively.  His daughter, Karen, and his sisters testified about

Stevens' troubled marriage and his childhood.[20]

　　　The state courts were not persuaded by Stevens' PCRA evidence and arguments.  <u>Stevens</u>

---

[19]  Each doctor testified at the PCRA hearing that if Lipecky had shown them Stevens' 22-page journal, gathered additional records, and provided them with more information from Stevens' family members, they would have advised Lipecky that Stevens had to undergo a neuropsychological battery of tests.  (Dkt. 16, App. 17 at 41-42; App. 22 at 38; App. 24 at 43, 73).  Dr. Armstrong performed those tests for the PCRA proceedings, and Dr. Altman and Dr. Martone testified before the PCRA Court that if they had had the results of that testing prior to the sentencing hearing, they would have told the jury that Stevens suffered from a substantially impaired capacity to conform his conduct to the requirements of the law.  (Dkt. 16, App. 22 at 45-46, 59; App. 24 at 23-24).  That is a mitigating factor that the trial court had refused to allow the jury to consider *because Dr. Martone's own sentencing-hearing testimony established that it did not apply*.  Dr. Altman and Dr. Martone also testified before the PCRA Court that, but for Lipecky's alleged ineffectiveness, they would have been able to buttress and provide more compelling testimony in support of the mitigating factor that they had testified about: that Stevens was under the influence of extreme mental or emotional disturbance at the time of the murders.  (Dkt. 16, App. 22 at 45-46, 59; App. 24 at 23-24).

[20]  Stevens sister Postich testified at the PCRA hearing that her brother was a loner as a child and was a late walker and talker.  (Dkt. 16, App. 19 at 4-5; <u>see</u> <u>also</u> Dkt. 30, App. 1, PCRA Ex. D).  She stated that he suffered from convulsions when he was young and that during one incident the fire department was called and administered oxygen to him.  (<u>Id.</u> at 6).  She also discussed two separate incidents in childhood when Stevens suffered head injuries.  (<u>Id.</u>)  She further testified that their father was an alcoholic, was sometimes violent, that their parents fought a lot, and that their mother threatened to kill herself.  (<u>Id.</u> at 9-10).  Stevens' other sister, Corbitt, provided testimony similar to that of Postich.  She described their parents difficult and often violent relationship, which she and her siblings witnessed.  (<u>Id.</u> at 35-36; <u>see</u> <u>also</u> Dkt. 30, App. 1, PCRA Ex. E).  She also recalled Stevens' childhood convulsions.  (<u>Id.</u> at 37).  Corbitt explained that she attended her brother's trial, but was never contacted by his counsel to be interviewed or to testify.  (<u>Id.</u> at 50-51).

II, 739 A.2d at 516-20.  (See also, Dkt. 17, App. 26, *PCRA Court Opinion* at 15-44).  The

Pennsylvania Supreme Court held that Lipecky's representation of Stevens did not fall below

Strickland's objective standard of reasonableness.[21]  Stevens II, 739 A.2d at 516-20.  It described

Lipecky's pre-sentencing preparation efforts and noted that his PCRA hearing testimony undercut

much of the defense experts' PCRA hearing testimony.

The Pennsylvania Supreme Court applied the correct legal standard when it evaluated this

and the rest of Stevens' ineffective assistance claims.  Id. at 512 (citing Commonwealth v.

Kimball, 724 A.2d 326 (Pa. 1999) (legal standard for evaluating ineffective assistance claims in a

PCRA proceeding is the same as the federal Strickland standard)).  Therefore, its adjudication

satisfies review under the "contrary to" clause of § 2254(d)(1).  See Terry Williams, 529 U.S. at

406; Werts, 228 F.3d at 202-04.  Thus, the only remaining questions for this Court to decide is

whether the Pennsylvania Supreme Court's adjudication of Claim I was an "unreasonable

application of" Strickland or "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding."  28

U.S.C. § 2254(d)(1)-(2).  It was neither.  See, e.g., Knowles, 129 S.Ct. at 1420 ("[B]ecause the

Strickland standard is a general standard, a state court has even more latitude to reasonably

determine that a defendant has not satisfied that standard.") (citing Yarborough v. Alvarado, 541

U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires

considering the rule's specificity.  The more general the rule, the more leeway courts have in

reaching outcomes in case-by-case determinations")).

---

[21]  Because Stevens did not satisfy the first prong of the Strickland analysis, the
Pennsylvania Supreme Court did not discuss the prejudice prong.

Stevens contends that this Court should not to defer to the state court's adjudication under AEDPA because the record shows that there are four pieces or types of evidence Lipecky either (i) possessed but failed to provide to the defense experts or otherwise failed to effectively use; or, (ii) failed to develop and then provide to the mental health experts.  I will address each *seriatim*.

**(a)    The journal**

The primary piece of evidence upon which Stevens relies is his 22-page journal.  (Dkt. 32, PCRA Ex. I).  He contends that, despite surmising that the journal contained useful information, Lipecky did not give it to the defense experts.  In support, he directs this Court to Dr. Landefeld's, Dr. Altman's, and Dr. Martone's PCRA hearing testimony, in which they testified that they did not see the journal prior to the sentencing hearing.[22]  (Dkt. 16, App. 17 at 19-20; App. 22 at 14; App. 24 at 27, 35).

The PCRA Court expressly rejected Stevens' contention that Lipecky did not provide the journal to Dr. Altman and Dr. Landefeld and credited Lipecky's testimony to the contrary.[23]  (Dkt.

---

[22]  I have already rejected Stevens' contention that Lipecky did not provide the journal to Dr. Altman and Dr. Landefeld.  I did so in <u>Stevens III</u> when I denied the related claim that counsel was ineffective for failing to investigate and present a diminished capacity defense to the charges of first-degree murder.  I repeat some of the analysis contained in that decision because it is equally applicable to the resolution of this claim.

[23]  The PCRA Court determined:

[W]e find that trial counsel made a substantial effort to develop mitigating evidence. This conclusion is supported by the following facts.

…Lipecky spent a considerable amount of time reviewing a lot of things with Dr. Altman, <u>including Appellant's handwritten notes [the journal.]</u>…

Lipecky then consulted with Dr. Landefeld.  Although Lipecky had his suspicions about the handwritten notes, he could not interpret it for purposes of diagnosing Appellant.  Consequently, he hand-delivered them to Dr. Landefeld's office.

17, App. 26, *PCRA Court Opinion* at 22-29).  See also Stevens II, 739 A.2d at 518 ("Contrary to the testimony of Dr. Altman at the PCRA hearing, Lipecky testified that he showed the twenty-two-page journal to Dr. Altman[.]").  Its finding of fact is supported by Lipecky's PCRA hearing testimony and the contemporaneous evidence.  During that hearing, Lipecky testified that he talked to Dr. Altman about Stevens' journal and that as a result of their discussion, and at Dr. Altman's instructions, he hand delivered the journal to Dr. Landefeld.  (Dkt. 16, App. 23 at 24-26, 110-16).  The credibility of Lipecky's recollection was buttressed by a memorandum from him to Dr. Landefeld, dated April 5, 1993, in which he stated:

> Dear Ralph:
> …
> I am enclosing a 22 page document (?) which was taken from the defendant's residence by the Commonwealth as a result of a search warrant.  I thought perhaps you would look at this to see if you can make something of it.  If you need anything further, please call me[.]
>
> s/ Wayne S. Lipecky.

(Dkt. 32, PCRA Ex. I).

I am bound by the PCRA Court's factual finding.  Stevens has not rebutted it by clear and convincing evidence, 28 U.S.C. § 2254 (e)(1), nor has he shown that it was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, id. § 2254(d)(2).  As a result, there is no merit to Stevens' claim that his counsel was ineffective for not providing the journal to Dr. Landefeld and Dr. Altman.

Stevens next argues that Lipecky provided ineffective assistance because he did not

---

(Dkt. 17, App. 26, *PCRA Court Opinion* at 22-25 (emphasis in original) (internal citations omitted); see also id. at 27 ("[Attorney Lipecky] had given Dr. Altman information orally which included information contained in [Stevens'] handwritten notes…. He gave Dr. Landefeld's office [Stevens'] handwritten notes pursuant to Dr. Altman's request.")

"ensure" that the journal was reviewed by the experts, ask them why it was not mentioned in their written reports, or otherwise question them about their conclusions regarding it. This argument likewise has no merit. Lipecky admitted during the PCRA hearing that, after he had talked to Dr. Altman about the journal and had hand delivered it to Dr. Landefeld's office, he did not ask either of them follow-up questions about it. His reasoning for that was simple: he had relied upon them to "to make whatever they could out of it." (Dkt. 16, App. 23 at 36). He "assumed that [the journal] was something that they had digested" and that they had reached their final diagnoses of Stevens after having reviewed it. (Id. at 44-45). His explanation provides a reasonable basis for his decision not to ask the experts any further questions about the journal.

With the benefit of hindsight, Lipecky admitted that there would have been no harm in asking Dr. Landefeld and Dr. Altman follow-up questions about the journal. (Dkt. 16, App. 23 at 32-33). Nevertheless, he was not unreasonable because he failed to do so. Lipecky justifiably assumed that Dr. Altman and Dr. Landefeld would have notified him if they determined that the journal was useful to the defense; after all, they were the experts. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable." Strickland, 46 U.S. at 689. That is why Strickland creates "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. In the present case, Stevens has failed to come forward with evidence to overcome that presumption.

The PCRA Court did accept Dr. Martone's PCRA hearing testimony that Lipecky did not show her the journal. Even with that finding, the Pennsylvania Supreme Court found no ineffective assistance. I cannot conclude that its decision was objectively unreasonable under

AEDPA's standard of review.  Although Lipecky obviously would have had no strategic reason for not sharing the journal with Dr. Martone, it cannot be said that, under the circumstances, he performed below the constitutionally required level of effective assistance.  See Flores-Ortega, 528 U.S. at 481 ("[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable."); Lewis, 581 F.3d at 113-14 (even if the petitioner rebuts the presumption that counsel had a strategic basis for his decision, the "court must still determine whether, in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance.") (internal citations and brackets omitted).

Lipecky already had spent a considerable amount of time with Dr. Altman and Dr. Landefeld preparing the defense case, which included the development of mitigation evidence in the event Stevens was convicted of first-degree murder.  Once the trial court found Stevens guilty, he retained Dr. Martone to provide additional support for the mitigation case. She would have testify in a few days, but Dr. Martone stated herself that being retained for the defense at that point in time was not unusual, particularly since she already had examined Stevens.  Lipecky arranged to meet with Dr. Martone in person, but she cancelled and told him it was not necessary.  They instead spoke on the phone for about an hour.  Lipecky also arranged for Dr. Martone to examine Stevens on the Sunday before she testified, which she did.  That Lipecky did not show the journal to Dr. Martone between the few days he had retained her and when she testified was not objectively unreasonable, in light of the fact that they did not meet in person, and especially because he had provided the journal to the other defense experts and they had not notified him that it was significant.  Moreover, after her second examination of Stevens, Dr. Martone provided diagnoses that were on point with that given by Dr. Altman, which he

made after having been provided with the journal.  Thus, Lipecky reasonably assumed that she had the information necessary to make accurate diagnoses.

### (b)    Stevens' letters to Freeland

Next, Stevens argues that Lipecky provided him with ineffective assistance because he failed to provide the experts with several letters sent by him to his first counsel, Freeland.  In one letter, dated August 2, 1992, Stevens wrote to Freeland that he believed Love had "fired a shot at me first[.]"  (Dkt. 30, App. 1, PCRA Ex. BB).  In a letter dated October 19, 1992, Stevens once again stated that Love had shot at him, and also discussed his belief that Brenda Jo was involved in drugs and that the police were somehow involved in trying to protect her and Armando's alleged illegal activities.  (Dkt. 30, App. 1, PCRA Ex. CC).  In another, undated letter, Stevens wrote to Freeland that he believed "there was a conspiracy to cause me harm."  (Dkt. 30, App. 1, PCRA Ex. DD).  Stevens contends that the accusations contained in the letters where unsubstantiated and demonstrated paranoid and delusional thinking and should have been provided to the defense experts.

Lipecky acknowledged that he did not provide the actual letters to the defense experts.  (Dkt. 16, App. 23 at 75-78).  He did, however, testify that he verbally related the contents of the letters to them.  (Id.)  In addition, he arranged for all of the defense experts to conduct clinical examinations of Stevens, thus providing each with the opportunity to hear his client's delusional allegations for themselves.  Additionally, the experts' reports establish that they were well aware of the unsubstantiated claims that Stevens was making after the murders about his wife and Love, and of the paranoia and delusional thinking evidenced in the letters.  (Dkt. 30, App. 1, PCRA Exs. H, M, and O).  Thus, Stevens' criticism of him regarding this evidence is baseless.

37

### (c)      Stevens' complete institutional and employment records

The file that Freeland provided to the Beaver County Public Defenders Office contained Stevens' partial military and employment records.  Lipecky provided those partial records to Dr. Altman.  (Dkt. 15, App. 9 at 18; Dkt. 30, App. 1, PCRA Ex. O).  Dr. Martone reviewed them as well.  (4/28/93 Trial Tr. at 42-43, 46-50; Dkt. 30, App. 1, PCRA Ex. M).  Dr. Landefeld was aware of at least the partial military record's contents.  (Dkt. 30, App. 1, PCRA Ex. H).  Nevertheless, Stevens argues that he received constitutionally ineffective assistance because Lipecky did not provide to the experts his full military and employment records.  He also argues that Lipecky should have obtained and provided to the experts his school records.

Stevens has failed to show that Lipecky's conduct was constitutionally deficient for not providing a complete set of the documents at issue to the defense experts.  If they required the additional documents, they should have asked Lipecky to get them.  The record shows that they were provided with additional records upon their request.  (See Dkt. 15, App. 9 at 18, where Dr. Altman testified at the sentencing hearing that following his first examination of Stevens in March 1993, he "was supplied with records from the Community Mental Health Center in Rochester at my request."; 4/28/93 Trial Tr. at 60, where Dr. Martone testified that she had asked for, and received, additional records prior to her second examination of Stevens; Dkt. 30, App. 1, PCRA Ex. M, where Dr. Martone requested additional records she thought she needed (and subsequently received): "It would be helpful if I could have the records from the Rochester Mental Health Clinic to review their diagnosis and findings.").  Cf. Van Hook, 130 S.Ct. at 18-19 (holding performance not deficient when counsel gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources); Strickland, 466 U.S. at

699 ("[Counsel's] decision not to seek more character or psychological evidence than was already in hand was ... reasonable.").

      (d )    **Information from Stevens' family**

Finally, Stevens argues that Lipecky provided him with constitutionally deficient assistance because he failed to develop his "social history" through interviews with his daughter, Karen, and his sister Rosemary Postich, and also failed to interview his other sister, Constance Corbitt. According to Stevens, they could have provided the defense with information about his troubled childhood, difficult family life, and medical history, including a history of convulsions and head injuries.

This contention likewise lacks merit. Both Dr. Martone and Dr. Altman testified at the sentencing hearing that Stevens was a reliable self-historian. (4/28/93 Trial Tr. at 44; Dkt. 15, App. 9 at 20). Lipecky therefore reasonably assumed that, during the doctors' extensive interviews with Stevens, they would obtain from him any relevant information about childhood injuries, abuse, injuries, and dysfunction in order to make accurate diagnoses and conduct the necessary neuropsychological testing. They did not indicate to Lipecky that they needed to speak with Stevens' relatives in order to form their diagnoses.

Lipecky also interviewed Karen and Postich prior to the trial and provided the doctor's with information that they had provided to him. He also called Karen to testify at the sentencing hearing. She, along with the defense experts, provided background information about Stevens relevant to the mitigation case, and Lipecky efforts in gathering the "social history" did not fall below that which is required by constitutionally effective counsel.

Stevens also faults Lipecky for not providing a copy of Freeland's notes to the defense

experts in which Freeland had jotted down several things, including: "Convulsions when infant–died," and "Battered husband syndrome." (See Dkt. 32, PCRA Ex. Z). He argues that the reference to convulsions was important and that the doctors should have been made aware of it. Lipecky provided a reasonable basis for not providing the note to the experts: he testified that when he reviewed the note, it was his impression that it was a reference to the charges Stevens was making about his wife abusing his daughter and grandchild– charges of which the experts were already aware. (Dkt. 16, App. 23 at 88).

### 3.

Stevens relies upon several recent cases to support his contention that Lipecky's mitigation investigation was objectively unreasonable.[24] I find those cases to be distinguishable. In Bond v. Beard, 539 F.3d 256 (3d Cir. 2008), *cert. denied* 130 S.Ct. 58 (2009), the petitioner's attorneys waited until the eve of the penalty phase to begin their preparations, and did not present any mental health evidence. In Outten v. Kearney, 464 F.3d 401 (3d Cir. 2006), the petitioner's attorneys' penalty-phase preparation consisted solely of: (1) a letter to the petitioner asking him for the names of witnesses; and (2) limited discussions with the petitioner and his mother (who had not shown an interest the petitioner). In Rompilla v. Beard, 545 U.S. 374 (2005), the petitioner's attorneys knew that the state intended to seek the death penalty by proving that he had a significant history of violent felony convictions, and that the state would attempt to establish that criminal history by proving his prior conviction for rape and assault. His attorneys also

---

[24] In Wong v. Belmontes, — U.S. — , 130 S.Ct. 383 (2009) (per curiam), another case upon which Stevens relies, the Supreme Court declined to resolve whether the petitioner's counsels' performance had been objectively unreasonable, because it determined that he could not establish prejudice.

knew that the state planned to emphasize his violent character by introducing a transcript of the rape victim's testimony from the earlier trial.  Despite that knowledge, and despite the fact that the prior conviction file was readily accessible, defense counsel inexplicably failed to review that file.  Counsels' failings did not end there.  After being again informed just one day prior to the sentencing hearing that the state intended to rely on the prior conviction file, and after obtaining a copy of the very transcript the state intended to present in aggravation, counsel failed to review either the transcript or examine the contents of the file.  In Wiggins v. Smith, 539 U.S. 510 (2003), counsels' investigation of mitigating evidence consisted of three sources; psychological testing, a written presentence report ("PSI"), which included a one-page account of the petitioner's personal history, and social services records the Department of Social Services ("DSS") documenting the petitioner's placements in foster care.  The Supreme Court held that the scope of trial counsels' investigation was unreasonable when they failed to investigate the petitioner's social history, despite knowledge from their client's PSI report that he lived in "misery as a youth," and had a background described as "disgusting."  The Court also found that counsels' performance was objectively unreasonable in light of the DSS records, which revealed that the petitioner's mother was a chronic alcoholic, and that he was sent to various foster homes. In Porter v. McCollum, — U.S. — , 130 S.Ct. 447 (2009) (per curiam), the "sum total of the mitigation evidence" that defense counsel presented was "inconsistent testimony about [the petitioner's] behavior when intoxicated and testimony that [petitioner] had a good relationship with his son.  Id. at 449.  The petitioner established in a post-conviction hearing that there was "extensive" and "substantial" mitigation evidence of which his counsel was completely unaware.

41

In contrast:

> This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, cf. Wiggins, 539 U.S. at 525, or would have been apparent from documents any reasonable attorney would have obtained, cf. Rompilla v. Beard, 545 U.S. 374, 389-393 (2005).  It is instead a case, like Strickland itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

Van Hook, 130 S.Ct. at 19 (parallel citations omitted).

I therefore conclude that the Pennsylvania Supreme Court's determination that Lipecky's investigation and performance was objectively reasonable withstands AEDPA's standard of review.[25]  I will, however, grant him a certificate of appealability on this claim, because the Court of Appeals previously granted him one regarding the related claim that Lipecky was ineffective for failing to investigate evidence of diminished capacity.[26]

**Claim II        The Assemblage Of the Second Panel Of Prospective Jurors**

**A.**

The selection of the jurors for the sentencing phase of Stevens' trial commenced on the

---

[25]  Because Stevens has failed to establish Strickland's first prong, I do not need to evaluate whether he was prejudiced.

[26]  28 U.S.C. § 2253 governs the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  It provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  Where the federal district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[.]"  Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

morning of Thursday, April 22, 1993.[27]  By the end of the next day, Friday, April 23rd, only nine

jurors had been selected.  The parties still needed to choose three more jurors and two alternates,

but only eight prospective jurors remained on the panel.  Therefore, a second panel of

prospective jurors had to be assembled.  (Dkt. 14, App. 4, 4/23/93 Tr. at 69-72).  Rule 1109 of

the Pennsylvania Rules of Criminal Procedure, <u>Exhaustion Of the Jury Panel</u>, governed this exact

circumstance and provided:

> When a sufficient number of qualified jurors are not present to permit selection of
> a jury, the court shall:
>
> > (a)  Require the officials designated by law to summon prospective jurors
> > to summon and return immediately from the county at large as many
> > qualified[28] and competent persons as shall be necessary; or
> >
> > (b)  Order in writing that the officials designated by law to summon
> > prospective jurors produce the jury wheel or master list in open court in
> > the presence of the judge, and to draw therefrom five names for every juror
> > required.  A venire shall then be issued requiring those persons so drawn

---

[27]  The state court record contains the entire *voir dire*.  The transcripts for that proceeding
are particularly disorganized, however.  They are located in the record as follows: April 22, 1993
at Dkt. 14, App. 3; April 23, 1993 (10:48 a.m.) at Dkt. 14, App. 4; subsequent *voir dire* for April
23, 1993, at Dkt. 14, App. 4 (in the middle of the appendix); April 26, 1993, at Dkt. 14, App. 6;
April 26, 1993 (1:43 p.m.) at Dkt. 15, App. 8.

[28]  The criteria for determining whether an individual is qualified to serve on a jury is set
by statute at 42 PA.CONS.STAT. § 4502 (West 1981) (amended Dec. 17, 2001), which at the time
provided:

> Every citizen of this Commonwealth who is of the required minimum age for
> voting for State or local officials and who resides in the county shall be qualified
> to serve as a juror therein unless such citizen:
> > (1) is unable to read, write, speak and understand the English language;
> > (2) is incapable, by reason of mental or physical infirmity, to render
> > efficient jury service; or
> > (3) has been convicted of a crime punishable by imprisonment for more
> > than one year and has not been granted a pardon or amnesty therefor.

be brought into court at a certain time.

Pa.R.Crim.P. 1109 (West 1993) (amended and renumbered Rule 635, effective April 1, 2001).

The trial court discussed with the parties the options available under Rule 1109 and noted its

preference for proceeding under subparagraph (a), as that was the more expeditious alternative.

(Dkt. 14, App. 4, 4/23/93 Tr. at 69-72).  Neither party objected (id. at 72-74, 152-53), and the

court issued the following Order:

> It appearing that the panel of available prospective jurors has been exhausted and
> no other qualified jurors are available to permit selection of a jury in this case, the
> Sheriff of Beaver County is directed to summon and return on April 26, 1993 at
> 8:00 a.m., from the County at large, 30 qualified and competent persons, to
> complete jury selection in this case.

(Dkt. 14, App. 5).

Deputies with the Sheriff's Office executed the trial court's order by serving summons

upon individuals at the Beaver Valley Mall on Saturday, April 24, 1993.[29]  When court

---

[29]  Stevens contends that the court allowed the Sheriff deputies charged with carrying out
its order to use their own criteria for selecting jurors.  That contention is untrue.  The court
ordered the Sheriff to summon "qualified and competent persons."  The court later noted that the
language it utilized in its order tracked the language in Rule 1109 and further that 42
PA.CONS.STAT. § 4502 set forth criteria for determining whether an individual was qualified and
competent to serve on a jury.  It held:

> We presume that the Sheriff acted in accordance with our instructions as well as these
> statutory requirements.  [Stevens] asserts no facts to the contrary.  Moreover, the record
> establishes that those individuals summoned by the Sheriff were qualified pursuant to the
> statute to serve as jurors.
>     Regarding the location from where the potential jurors were chosen, we
> directed the Sheriff to summon the jurors from the county at large in accordance
> with Pa.R.Cr.P. 1109.  Except for this provision, the Rule neither suggests how
> the sheriff should carry out his responsibilities nor requires the court to so
> designate.  Rather, it contemplates that individuals from throughout the county be
> summoned.  Although the Beaver Valley Mall is one particular location, citizens
> from all different areas of the county and walks of life frequent said mall.… [t]his
> location was not chosen because the Sheriff determined that the criteria for

44

reconvened on Monday, April 26rd, the *voir dire* of the eight remaining prospective jurors from the first panel was completed.[30]  (Dkt. 14, App. 6, 4/26/93 Tr. at 2-59).  Two jurors were selected from among those eight individuals.  (Id.)  The parties needed to select one more juror and two alternates from the second panel of prospective jurors.  The court recessed in order to provide counsel with sufficient time to review the second panel's juror information questionnaires.  (Id. at 52).  Afterwards, twelve prospective jurors from the second panel underwent individual *voir dire* before the one remaining juror and two alternates were selected.  (Id. at 62-96; Dkt. 15, App. 8, 4/26/93 Tr., 1:43 p.m., at 3-60).

## B.

Stevens raises numerous constitutional challenges to the manner in which the second prospective juror panel was assembled.  He claims that the deputies that summoned the individuals at the Beaver Valley Mall "pre-selected" the jury in violation of his Sixth Amendment right to have his counsel participate in the jury-selection process.  He also contends that the process was arbitrary in violation of the Eighth Amendment; that it failed ensure that a fair cross-section of the community was selected in violation of his due process and equal protection rights; and, that his counsel was ineffective for failing to object at the trial court level

---

summoning jurors was that they be a "shopper at the Beaver Valley Mall on Saturday morning" as suggested by [Stevens].  Instead, by going to one location where a diverse cross-section of the county's population could be found, the Sheriff was able to efficiently and effectively execute our Order.

(Dkt. 17, App. 26, *PCRA Court Opinion* at 48).

[30]  That morning, the court administered the oath and provided general instructions to the second panel of prospective jurors and they filled out juror questionnaires.  (See Dkt. 14, App. 6, 4/26/93 at 52).

and on direct appeal.  The PCRA Court denied Stevens' claims on the merits (Dkt. 17, App. 26, *PCRA Court Opinion* at 44-50), and the Pennsylvania Supreme Court affirmed in <u>Stevens II</u>, 739 A.2d at 519-20, rejecting his numerous constitutional challenges.  In addition to finding no federal constitutional infirmity, it also determined that the second panel was summoned in accordance with state law in a manner similar to that which it had approved in <u>Commonwealth v. Albrecht</u>, 511 A.2d 764 (Pa. 1986).[31]

 The state court's decision easily withstands AEDPA's review.  Stevens has not shown that the method by which the second panel of prospective jurors was assembled violated his federal constitutional rights, or that he was prejudiced by the process or by his counsel's decision not to raise any objection at trial or on direct appeal.  There is no evidence whatsoever that the deputies "pre-screened" the prospective jurors in an improper manner, or that the process utilized in serving the summons was anything other than neutral and random.  Thus, Stevens' Eighth Amendment, due process, and equal protection claims plainly have no merit, as they are premised upon his unsupported allegations that the assemblage of the second panel was arbitrary,

---

[31] In <u>Albrecht</u>, the trial court issued an order under Rule 1109 for thirty additional prospective jurors.  That order was implemented by deputies from the Bucks County Sheriff's Office, who proceeded to various assigned areas in county.  Their instructions were to serve summons on residents of Bucks County who did not have vacations planned for the next two weeks.  The deputies, after visiting several shopping centers in the county, issued twenty-nine summons.  The Pennsylvania Supreme Court concluded that "the process of selecting [the additional prospective jurors] was proper."  <u>Albrecht</u>, 511 A.2d at 771.

 Like Stevens, the defendant in <u>Albrecht</u> challenged in his federal habeas petition the process by which the second panel of prospective jurors was assembled.  He alleged, as Stevens does here, that the process of summoning prospective jurors from shopping centers failed to provide him with a venire selected from a fair cross-section of the community.  The United States District Court for the Eastern District of Pennsylvania determined that Albrecht's constitutional challenges had no merit.  <u>Albrecht v. Horn</u>, 314 F.Supp.2d 451, 467 (E.D. Pa. 2004).

non-neutral, or non-random.  There also is no evidence to support his contention that the second

panel did not represent a fair cross-section of the community.  See Stevens II, 739 A.2d at 520

("A review of the *voir dire* shows that the potential jurors were from different locations in Beaver

County and were of different ages and genders.").

Stevens' contention that the process utilized violated his right to have his counsel

participate in the jury-selection process is equally without merit.  The record establishes that on

Monday, April 26, 1993, the prospective jurors that had been served with summons on Saturday

arrived at the courthouse and completed juror questionnaires.  Defense counsel was given a

reasonable opportunity to examine the questionnaires prior to *voir dire*, and then *voir dire* was

conducted under the normal procedures.  Thus, defense counsel fully participated in the jury-

selection process.

Stevens also has not shown that his counsel's decision not to challenge the assemblage of

the second prospective jury panel was objectively unreasonable under Strickland or that he was

prejudiced.  There was no basis for defense counsel to object to the process utilized, as it was in

accordance with Pennsylvania law, and also because there was no evidence that it had been

carried out in manner that was violative of the Constitution.  Additionally, it was objectively

reasonable for counsel to have been satisfied with the process as they had sufficient opportunity

to review the second panelists' questionnaires and examine them during individual *voir dire*.  The

record also shows that the process yielded a panel from which the parties had no problem

selecting one juror and two alternates.

**Claim III        Proportionality Review**

At the time of Stevens' conviction, the Pennsylvania Supreme Court was statutorily

required to conduct a comparative proportionality review during the direct appeal of all death

penalty cases to determine whether similar defendants received similar sentences.  42

PA.CONS.STAT. § 9711(h)(3)(iii) (1993) (repealed by Act No. 1997-28, effective June 25, 1997).

The Pennsylvania Supreme Court conducted that review in Stevens I and concluded that "the

information compiled by the Administrative Office of Pennsylvania Courts [("AOPC")] indicates

that the sentence imposed in this case is not disproportionate to the sentence imposed in similar

cases."  670 A.2d at 628.

In Claim III, Stevens asserts that his due process rights were violated because the

Pennsylvania Supreme Court failed to provide him with a meaningful proportionality review and

did not provide him with the opportunity to review and challenge the information upon which it

relied.  As a result, he contends, he also was deprived of adequate appellate review of his death

sentence, in violation of the Eighth Amendment.[32]  Stevens raised Claim III in the PCRA

proceeding.  To support it, he presented at the PCRA hearing the testimony of Professor Eugene

P. Ericksen, Ph.D., an expert in statistics who studied and evaluated Pennsylvania's

proportionality review database.  (Dkt. 16, App. 18).  Dr. Ericksen testified that the data upon

which the proportionality review was based was fundamentally flawed by systemic and case-

specific defects and he opined that the system's flaws did not allow for a meaningful

_____

[32]  The Eighth Amendment does not require proportionality analysis, Pulley v. Harris, 465
U.S. 37, 50-51 (1984), but federal courts have held that once a state creates a right to
proportionality review, then the state may not arbitrarily deny that right to a particular defendant.
See Middleton v. Roper, 498 F.3d 812, 821-22 (8th Cir. 2007).

48

proportionality review.

The PCRA Court rejected Prof. Ericksen's testimony.  It evaluated his testimony against the testimony given by Zygmont Pines, Esq., chief legal counsel for the AOPC, in the case Commonwealth v. Terry, Docket No. 1563-79 (C.P. Mont.) (which was admitted as PCRA Ex. C (Dkt. 30, App. 1)).  The PCRA Court determined:  "Professor Ericksen's factual conclusions concerning the database are wrong, and his opinion based thereon is rejected."  (Dkt. 17, App. 26, *PCRA Court Opinion* at 41-43).  The Pennsylvania Supreme Court affirmed, noting that it has "repeatedly rejected claims that our comparative proportionality review process is constitutionally defective."  Stevens II, 739 A.2d at 529 (citing Commonwealth v. Porter, 728 A.2d 890 (Pa. 1999); Commonwealth v. Gribble, 703 A.2d 426 (Pa. 1997)).

Stevens argues that, notwithstanding the deferential standard of review that this Court must apply to the state court's decision, he is entitled to habeas relief.  His argument is unconvincing.  The PCRA Court expressly rejected Prof. Ericksen's testimony and there is no basis for this Court to disturb or reevaluate that credibility determination under AEDPA.  28 U.S.C. §2254(d)(2), (e)(1).  Additionally, this claim is foreclosed by the Court of Appeals' decision in Riley v. Taylor, 277 F.3d 261 (3d Cir. 2001) (*en banc*).  In that case, the petitioner argued that the proportionality review conducted by the Delaware Supreme Court violated his due process rights because there were flaws in the proportionality analysis and the state court had compared his case against cases that did not furnish appropriate comparisons.  In rejecting this claim, the Court of Appeals observed, "it is unclear whether, under Third Circuit law, a state proportionality-review statute creates any cognizable liberty interest for due process purposes." Id. at 311.  Assuming defendants have such a liberty interest, "a federal court may only inquire

into whether the state 'undertook its proportionality review in good faith and found that [the

defendant's] sentence was proportional to the sentences imposed in cases similar to his.'"  Id.

(quoting Walton v. Arizona, 497 U.S. 639, 656 (1990)).  "[I]f the federal court finds that the

review was undertaken in good faith, it cannot 'look behind' the state court's conclusion of

proportionality to consider whether the state court misapplied state proportionality law."  Id. at

311-12.  In this case, there is no evidence that the Pennsylvania Supreme Court conducted its

proportionality review in bad faith.[33]  Therefore, under Riley, I cannot "look behind" its

proportionality analysis to consider whether it properly applied the proportionality statute.

Moreover, any purported constitutional error was harmless.

In conclusion, Stevens' due process claim fails, as does his related Eighth Amendment

claim.  My decision is in accordance with several other district courts that similarly have rejected

challenges to the Pennsylvania Supreme Court's proportionality review process.  See Lambert v.

Beard, Docket No. 02-9034, 2007 WL 2173390, *51-52 (E.D. Pa. July 24, 2007) (rejecting

claims that petitioner was denied a meaningful proportionality review because he was not given

an opportunity to review and challenge the information relied on by the Pennsylvania Supreme

---

[33]  Stevens claims that he was denied a meaningful appellate review of his sentence
because he allegedly did not have the opportunity to litigate the propriety of the system the
Pennsylvania Supreme Court used in its proportionality review.  However, the Pennsylvania
Supreme Court has explained that under state law: "*[p]roportionality review is not an
adversarial proceeding*.  Proportionality review is an appellate process, statutorily mandated, to
ensure that sentences of death are not imposed by Pennsylvania juries and/or jurists, in a
disproportionate manner."  Commonwealth v. Laird,  726 A.2d 346, 361 (Pa. 1999) (emphasis
added) (citing Commonwealth v. Banks, 656 A.2d 467, 474 (Pa. 1995)).  It has further noted that
"that the information gathered by the [AOPC] for use in death penalty proportionality review is
available to the general public free of charge[,]" and it has repeatedly rejected assertions that
defendants did not have access to the information it utilized in its proportionality review.  Id.
(citing Commonwealth v. DeHart, 516 A.2d 656 (Pa. 1986)).

Court, and because the database, data collection instruments, and methodology employed in the review process allegedly were "egregiously" flawed; petitioner presented no evidence that that Pennsylvania Supreme Court conducted its proportionality review in bad faith) (certificate of appealability denied); Rollins v. Horn, Docket No. 00-1288, 2005 WL 1806504, *39-40 (E.D.Pa. July 26, 2005) (denying petitioner's challenges to the procedure by which the Pennsylvania Supreme Court conducted its proportionality review because that court had examined the procedures in Commonwealth v. Gribble and had found nothing arbitrary or capricious about them) (certificate of appealability denied); Kindler v. Horn, 291 F.Supp.2d 323, 351-53 (E.D. Pa. 2003) (denying petitioner's claims that the Pennsylvania Supreme Court's proportionality review did not provide him with the meaningful appellate review in violation of the Eighth and Fourteenth Amendments) (certificate of appealability denied); Laird v. Horn, 159 F.Supp.2d 58, 124 (E.D. Pa. 2001) (denying petitioner's challenge to proportionality review because there was no evidence that the Pennsylvania Supreme Court had undertaken its review in bad faith); Jermyn v. Horn, Docket No. 97-634, 1998 WL 754567 *52-54 (M.D. Pa. Oct. 27, 1998) (rejecting petitioner's due process and Eighth Amendment challenges to his proportionality review), aff'd 266 F.3d 257 (3d Cir. 2001) (affirming summarily district court's denial of certain claims, including his challenge to proportionality review).

**Claim IV     The Trial Court's Instruction On Torture and the Sufficiency Of the Evidence Establishing That Aggravating Circumstance**

Stevens argues that the trial court's instruction on the aggravating circumstance of torture, 42 PA.CONS.STAT. § 9711(d)(8), was unconstitutionally vague in violation of the Eighth

Amendment and that his counsel was ineffective for failing to object and litigate the alleged constitutional error.  He also contends that the evidence was insufficient to establish that aggravating circumstance (which pertained solely to Love's murder).  The Pennsylvania Supreme Court denied Stevens' challenges to the instruction on torture in <u>Stevens II</u>, 739 A.2d at 522-24. It denied the sufficiency of the evidence portion of this claim on direct appeal in <u>Stevens I</u>, 670 A.2d at 628.

**A.**

**1.**

In <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), the United States Supreme Court held that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner.  The Court sounded this theme in <u>Gregg v. Georgia</u>, 428 U.S. 153, 189 (1976): "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably limited so as to minimize the risk of wholly arbitrary and capricious action."  In <u>Godfrey v. Georgia</u>, it was explained:

> [I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.  Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion."  <u>Gregg v. Georgia</u>, *supra*, at 196, n. 47.  <u>See</u> <u>also</u> <u>Proffitt v. Florida</u>, 428 U.S. 242 [1999]; <u>Jurek v. Texas</u>, 428 U.S. 262 [1976].  It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death."

446 U.S. 420, 428 (1980) (additional citations contained in footnotes and parallel citations omitted).

52

A state's sentencing procedures can run afoul of the rule set down in <u>Furman</u> and <u>Gregg</u> if: (1) the state defines its aggravating circumstances too broadly, either in a statute or in an instruction given to the jury, such that these circumstances could apply to every possible defendant convicted of murder, <u>see</u> <u>Tuilaepa v. California</u>, 512 U.S. 967, 972 (1994); <u>see</u> <u>also</u> <u>Godfrey</u>, 446 U.S. at 428; or, (2) the state defines its aggravating circumstances in a way that is too vague, such that they fail to "channel the [jury's] discretion by 'clear and objective standards' that provide 'specific and detailed guidance.'" <u>Godfrey</u>, 446 U.S. at 428 (citations omitted). When jury instructions are overly broad or overly vague they create the risk that the jury will arbitrarily impose the death penalty in violation of the Eighth Amendment.  <u>Id.</u>

In <u>Godfrey</u>, a Georgia jury was instructed on an aggravating circumstance that provided that a defendant could be sentenced to death if it found beyond a reasonable doubt that the murder "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." <u>Id.</u> at 422, 426.  In his opinion announcing the judgment of the Court, Justice Stewart observed that the words "outrageously or wantonly vile, horrible and inhuman" did not, standing alone, impose any limitation on "the arbitrary and capricious infliction of the death sentence." <u>Id.</u> at 428.  Because "[a] person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman,'" it was concluded that the trial court gave no guidance concerning the meaning of those words and its interpretation of them "can only be the subject of sheer speculation." <u>Id.</u> at 428-29.  Since there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not," it was held that the challenged jury instruction was unconstitutionally vague.  <u>Id.</u> at 433.

The holding in Godfrey was applied in Maynard v. Cartwright, 486 U.S. 356 (1988), where the Court again struck down a jury instruction as unconstitutionally vague.  In that case, the jury sentenced the defendant to death relying on two aggravating circumstances, one being that the murder was "especially heinous, atrocious, or cruel."  Id. at 358-59.  Addressing the jury instruction, the Court stated the following:

> [T]he language of the Oklahoma aggravating circumstance at issue -- "especially heinous, atrocious, or cruel" -- gave no more guidance than the "outrageously or wantonly vile, horrible or inhuman" language that the jury returned in its verdict in Godfrey.  The State's contention that the addition of the word "especially" somehow guides the jury's discretion, even if the term "heinous" does not, is untenable.  To say that something is "especially heinous" merely suggests that the individual jurors should determine that the murder is more than just "heinous," whatever that means, and an ordinary person could honestly believe that every unjustified, intentional taking of human life is "especially heinous."

Id. at 363-64.  Accordingly, the Court held that the instruction violated the Eighth Amendment and vacated the defendant's death sentence.  Id.

## 2.

Stevens argues that the torture instruction given in his case was unconstitutionally vague because, similar to the instruction given in Maynard, it instructed that the jury could find that the aggravating circumstance of torture was present in the murder of  Love it if found that his murder was "heinous or atrocious or cruel and show[ed] exceptional depravity."  See, e.g., Shell v. Mississippi, 498 U.S. 1 (1990); Espinosa v. Florida, 505 U.S. 1079, 1081 (1992); Richmond v. Lewis, 506 U.S. 40, 47 (1992); Walton v. Arizona, 497 U.S. 639, 654 (1990).  When language in jury instructions is challenged, the language in question "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The

court must then consider "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Id. (quoting Boyde v. California, 494 U.S. 370, 380 (1990)); see also Victor v. Nebraska, 511 U.S. 1, 6 (1994); Smith v. Horn, 120 F.3d 400, 411 (3d Cir. 1997)).

Applying this standard, the shortcoming in Stevens' argument is immediately obvious. He fails to acknowledge that the instruction given in his case contained a much more detailed definition of torture than he recites.  See Maynard, 486 U.S. at 364-65 (approving the limitation of the "heinous, atrocious, or cruel" aggravating circumstance to killings in which the victim suffered "some kind of torture or serious physical abuse" prior to the murder).  The trial court's complete instruction on the aggravating circumstance of torture was as follows:

> Now in proving death committed by means of torture as an aggravating circumstance, the capital legislature did not intend to limit means of torture to those used in the Middle Ages or in some horror movies that somebody may have seen such as a rack or boiling in oil.  *For a person to commit murder by means of torture under this aggravating circumstance he must intend to inflict a considerable amount of pain or suffering and must do so in a manner or by means that are unnecessarily heinous or atrocious or cruel and show exceptional depravity.  Implicit in this definition of torture is the concept that the pain or suffering imposed upon the victim was unnecessary or more than needed to effectuate the death of the victim.*  The intent to inflict a considerable amount of pain or suffering may be inferred from the circumstances.  Neither the efficacy of the means employed by the defendant to murder the victim or the immediacy of death is in itself a determinant, although in the question of whether the offense was committed by means of torture, it does not matter [that] a victim may not have actually suffered pain due to loss of consciousness, for example, in determining whether the defendant had the intent to inflict a considerable amount of pain.  A defendant's ability to achieve a particular result does not negate the possibility that he intended to bring about the result.

(Dkt. 31, App. 5 at 65-66 (emphasis added)).

The trial court's instruction advised the jury not only that the manner in which Stevens

killed Love had to have been unnecessarily heinous or atrocious or cruel, showing exceptional

depravity, but that it also had to have been committed with the intent to inflict a considerable

amount of pain and suffering upon Love that was unnecessary or more than needed to effectuate

his death.[34] Thus, the instruction was much different than those given in the cases upon which

Stevens relies.  In his case, the trial court's instruction sufficiently channeled the jury's discretion

to prevent an arbitrary and capricious sentencing decision, counsel was not ineffective for failing

to challenge the instruction, and the Pennsylvania Supreme Court's decision denying this claims

satisfies AEDPA's standard of review.

**B.**

Stevens also asserts that there was insufficient evidence to establish the aggravating

circumstance of torture because the shooting occurred in a manner of seconds, he was acting

impulsively and under mental distress, and the aggravator cannot be established simply by

showing that Love suffered pain before dying.  The relevant question in analyzing this claim is

whether, after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have concluded that the torture aggravator was present.  Lewis v. Jeffers, 497

U.S. 764, 781-82 (1990) (citing the familiar sufficiency of the evidence test set for in Jackson v.

Virginia, 443 U.S. 307 (1979)).  Applying this standard, the Pennsylvania Supreme Court held

that the evidence presented at trial was sufficient to support the aggravating circumstance of

torture because:

--------

[34]  If the instruction given was unconstitutionally vague, habeas relief would be
unavailable if the Pennsylvania Supreme Court's applied a narrowing construction when it
reviewed the instruction in the PCRA appeal.  See, e.g., Bell v. Cone, 543 U.S. 447 (2005) **(per
curiam)**.  Because the trial court's instruction did not run afoul of the constitution, this Court
does not need to resort to that analysis.

The record reveals that after he shot [Brenda Jo] Stevens twice in the head, Appellant turned to Love and began rapidly firing a series of shots into Love's body.  After a brief pause, Appellant fired a final shot into Love's scrotum area.

The Commonwealth also introduced testimony regarding the nature of the ammunition chosen by Appellant and the fact that hollow point bullets cause a great deal of damage to the victims.  The pathologist, Dr. Smith, testified that Love was shot eight times and received nine wounds.  Although the nine gunshot wounds caused Love's death, Dr. Smith testified that none of these wounds individually were capable of causing death and that several of the wounds were the result of Love's attempt to defend himself.  It was also Dr. Smith's testimony that none of these wounds caused Love to lose consciousness and, as a result, he suffered a great deal of pain before he died in the hospital.

We conclude that the jury could infer the intent to inflict a considerable amount of pain and suffering from the number and placement of shots into Love's body, especially the final shot into Love's scrotum area, the type of ammunition chose by the Appellant, and the fact that Love remained conscious for a long period of time before he died.

Stevens I, 670 A.2d at 628.

Contrary to Stevens' assertion, the evidence summarized above shows more than just that Love suffered pain before dying.  Compare Commonwealth v. Brode, 564 A.2d 1254, 1258 (Pa. 1989) (vacating sentence where the "only evidence bearing on the issue of torture was that of the pain the victim suffered from the first two shots before the shots to the chest killed her." (emphasis added)).  As the Pennsylvania Supreme Court held, the aggravating circumstance of torture was supported by the constitutional minimum of evidence necessary.  I cannot conclude that Stevens is entitled to relief on this claim under the standards set forth in Jackson v. Virginia and AEDPA, 28 U.S.C. § 2254(d).

**Claim V        The Instruction On the "Created A Grave Risk Of Death To Another In Addition To The Victim" Aggravating Circumstance**

As to both victims in this case, the jury found the aggravating circumstance set forth at 42 PA.CONS.STAT. § 9711(d)(7) – that Stevens "knowingly created a grave risk of death to another person in addition to the victim of the offense."  The Pennsylvania Supreme Court has narrowly constructed this aggravating circumstance as applying *only where the risk of death is to others beside the actual or intended victim(s)*.  Commonwealth v. Stokes, 615 A.2d 704, 713 (Pa. 1992).  Applying this limiting construction, it has upheld the aggravating circumstance where, as is the case here, the defendant fired gunshots into a crowded bar.  The Pennsylvania Supreme Court also has upheld it where the defendant wielded an axe on a crowded bus, or set fire to a home, killing three people and endangering the life of another.  See Commonwealth v. Paolello, 665 A.2d 439, 456-57 (Pa. 1995) (collecting cases).  By contrast, it has held this aggravating circumstance "completely inapplicable" when the defendant killed one of his victims in an empty room.  Stokes, 615 A.2d at 713-714; see also Commonwealth v. Bolden, 753 A.2d 793, 798-99 (Pa. 2000) (invalidating the jury's finding of the § 9711(d)(7) aggravating circumstance because the second victim entered the store after defendant killed his first victim).

In Claim V, Stevens contends that the instructions given at his sentencing hearing erroneously allowed the jury to find the § 9711(d)(7) aggravating circumstance without finding that he created a risk to others besides the intended victims.  Therefore, he argues, the instructions were unconstitutionally vague in violation of the Eighth Amendment and his counsel was ineffective for failing to object.  The Pennsylvania Supreme Court denied this claim in Stevens II, 739 A.2d at 524-25.  Its decision was in accordance with the relevant United States

Supreme Court authority, as required by AEDPA.

As the Pennsylvania Supreme Court held, the trial court gave an instruction that comported with its limiting construction of the "created a grave risk of death of another" aggravating circumstance.  When considered in the context of the instructions as a whole, <u>see</u>, <u>e.g.</u>, <u>Estelle</u>, 502 U.S. at 72, it is not reasonably likely that the jury applied the challenged instruction in a way that violates the Constitution, <u>Boyde</u>, 494 U.S. at 380.  The trial court explained the aggravating circumstance as follows:

> [I]n connection with the death of Brenda Jo Stevens only the following matters if proven to your satisfaction beyond a reasonable doubt can be aggravating circumstances.
> First, in the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.  A person knowingly creates a grave risk of death to another person in addition to the victim of the offense if he's aware that his conduct is of that nature or that such circumstances exist.  *Therefore, in deliberating on this aggravating circumstance you should consider all of the evidence concerning the defendant's conduct at the time of the shooting and the attendant circumstances including the testimony as to the number of people in the bar at the time of the shooting, their relative location and proximity with reference to the defendant at the time of the shooting, the number and direction of shots fired, the danger of ricocheted bullets, whether or not the defendant pointed the gun at another person or persons, evidence of the spent bullets, whether or not the defendant pointed the gun at another person or persons, evidence of the spent bullets in the bar stool, evidence of a hole in the coat of one of the patrons and whether or not that hole was caused by the bullet and evidence of fragments found and their location in the area of the bar.*

(Dkt. 31, App. 6, 4/29/93 Tr. at 62-63) (emphasis added).[35]

The above-cited instruction narrowed the evidentiary considerations of the jury and provided clear and objective standards for the jury's consideration.  It conveyed that the

---

[35]  When it explained the § 9711(d)(7) aggravating circumstance with respect to Love's murder, the trial court told the jury that it would not repeat the instruction and directed it to refer back to the instruction given for Brenda Jo's murder.  (Dkt. 31, App. 6, 4/29/93 Tr. at 65).

§ 9711(d)(7) aggravator applied where the risk of death was to others beside the actual victims in the case.  The instruction focused attention on the number of persons in the bar, where they were in regard to the shooting, and whether there was danger created to those persons as a result of the shooting.  It did not refer to the second victim as a person whose safety might be at risk during the shooting of the first victim.  The instruction was not ambiguous, either when considered alone or in conjunction with trial court's instructions on all of the aggravating circumstances, and it is not reasonably likely that the jury interpreted it erroneously.[36]

**Claim VI          Double Counting Of the Same Aggravation Evidence**

In Claim VI, Stevens argues that the Eight Amendment's proscription against arbitrary and capricious death sentences prohibits a jury from basing its finding of two or more

---

[36]  A review of the closing arguments of the prosecutor and Lipecky reinforce that the § 9711(d)(7) aggravator was not ambiguously conveyed to the jury.  Their arguments, consistent with the trial court's instructions, made clear that the aggravator was regarding the danger in which Stevens' actions placed the other bar patrons, and not the other victim.  In arguing that the Commonwealth had established this aggravator, the prosecutor emphasized that the evidence showed that Stevens was "swinging the gun back and forth past this thickly populated corner of the bar and firing that gun one, two, three, four, five, six, seven, eight, nine, ten.… [T]hese red dots signify the bullet fragments moving at 935 feet per second, where people are crowded in a space that is no wider than six feet, he's firing a gun left and right."  The prosecutor emphasized that the bullets were "flying like crazy" and she directed the jury's attention to where the many stray bullets landed and how close other people in the bar were to being shot.  She discussed how the bar patrons scrambled in panic and fear to try to avoid being shot.  She discussed the testimony of several witnesses who described the mayhem that ensued once Stevens opened fire. (Dkt. 31, App. 6, 4/29/93 Trial Tr. at 23-27).

Similarly, Lipecky's closing argument also showed that there was no ambiguity regarding this aggravator.  He admitted, as he had to, that the "conviction of another murder" aggravating circumstance (§ 9711(d)(11)) was present because it could not be disputed that Stevens had been convicted of the first-degree murder of both victims.  Lipecky then turned his discussion towards the § 9711(d)(7) aggravator and admitted the existence of it as well, stating: "the defense also admits that the defendant obviously created grave risk of death *to other people at Armando's restaurant other than the victims*."  (Id. at 39-40).

aggravating circumstances on the same factual predicate.[37]  He contends that this principle was violated in his case because it is reasonably likely that the instructions given led the jury to believe that it could find the "created a grave risk of death to another person in addition to the victim" aggravator (§ 9711(d)(7)) and the "convicted of another murder" aggravator (§ 9711(d)(11)) on the same factual predicate, *i.e.*, that there were two murder victims.  He also argues his counsel was ineffective for failing to object.

The Pennsylvania Supreme Court denied Claim VI in Stevens II, 739 A.2d at 525-26, and Stevens certainly is entitled to no relief on it in this Court.  I already have rejected the underlying premise of this claim, which is Stevens' meritless contention that there is a reasonable likelihood that the instruction given on the § 9711(d)(7) aggravator mislead the jury to believe that the murder of Brenda Jo could be considered in establishing that aggravator for the purpose of sentencing Love, and *vice versa*.  As I held in my disposition of Claim V, the trial court properly conveyed to the jury that it was to consider the risk of death *to the other patrons of the bar* in determining whether the § 9711(d)(7) aggravator was established.  Its instruction on the

---

[37]  The Commonwealth rightly points out that Stevens has failed to cite any decision by the United States Supreme Court in which it was held that it is constitutional error to submit to the jury separate, multiple aggravators based upon the same underlying factual predicate.  He cites to a decision by the United States Court of Appeals for the Tenth Circuit, United States v. McCullah, 76 F.3d 1087, 1111 (10th Cir. 1996), and other decisions issued by federal district courts and state courts (see Dkt. 19 at 78 n.30).  None of these decisions represent "clearly established Federal law, *as determined by the Supreme Court of the United States*."  28 U.S.C. § 2254(d) (emphasis added); see Knowles, 129 S.Ct. at 1419 ("[T]his Court has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.'") (citations omitted).  However, even if it could be said that it is "clearly established" under United States Supreme Court precedent that the finding of two or more aggravating circumstances on the same factual predicate is prohibited under the Eighth Amendment, that prohibition was not violated in this case for the reasons set forth herein.

"conviction of another murder" aggravator, § 9711(d)(11), appropriately conveyed to the jury that this aggravator was regarding a separate factual predicate (that is, with respect to the sentence to be imposed for Brenda Jo's murder, that Stevens had been convicted of the murder of Love, and *visa versa*).

**Claim VII     The Jury Was Not Properly Death Qualified Or Life Qualified**

I now turn to Claim VII, in which Stevens contends that the trial court's exclusion for cause of a prospective juror who had expressed her personal opposition to the death penalty violated Witherspoon v. Illinois, 391 U.S. 510, 522 (1968), and that counsel ineffectively failed to object to her removal.  In Witherspoon, the Supreme Court held that a sentence of death cannot be carried out if the jury that imposed it was chosen by excluding potential jurors for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.  Id.

**A.**

Stevens bases Claim VII upon the following *voir dire* of N. Hartling, which he claims was insufficient to justify her excusal for cause:

> The Court:     As you know you are being considered as a juror in a case involve [sic] the deaths by homicide of Brenda Jo Stevens and Michael Love.… The Defendant is Andre Stevens and the Commonwealth has secured a verdict of guilty of murder of the first degree with respect to both of those deaths. It is now up to a jury to determine whether to impose the penalty of death or the penalty of life imprisonment upon Mr. Stevens.  Do you have an opinion about the death penalty which would prevent you from following the Court's instructions as to what penalty should be imposed?

A.             I don't believe in the death penalty.

The Court:    Very well.

[Prosecutor]: Challenge for cause, Your Honor.

The Court:    Very well.  You are excused, thank you.

(Juror excused).

The Court:    If there's an objection for challenge for cause, even though it is not at side bar, counsel should raise it so that the Court can rule on it....

(Dkt. 14, App. 3 at 160-61).

When the Pennsylvania Supreme Court denied Claim VII on the merits, it held:

It is well settled that a prospective juror may be excluded for cause when his or her views on capital punishment are such as would prevent or substantially impair the performance of his or her duties as a juror in accordance with his or her instructions and his or her oath.... When the prosecutor seeks to remove a juror because that juror expresses views against the death penalty that prevent the juror from following the instructions of the court, we refer to this as "death-qualification."  Appellant argues that trial counsel was ineffective for failing to object to the trial court's striking of this juror for cause where there was insufficient testimony concerning whether she would be able to apply the court's instructions regardless of her anti-death penalty views.  We disagree.

The decision whether to disqualify a juror is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion.  Commonwealth v. Colson, 490 A.2d 811, 818 (Pa. 1985), *cert. denied*, 476 U.S. 1140 (1986).  The trial court makes that determination based on the prospective juror's answers to questions and demeanor.  Id.  *Here, the remainder of the voir dire indicates that the trial court did not deny counsel the opportunity to question the veniremen or to attempt to rehabilitate the prospective jurors if counsel chose to do so, and specifically directed Appellant's counsel to object if he thought the trial court's granting of the challenge for cause was improper.  Our review of the voir dire indicates that with most other jurors, except where the cause for striking the juror was immediately clear, the court inquired as to whether that juror would be able to set aside his or her personal opinion of the death penalty and follow the instructions of the court.  We accept* the statement of the trial court in its [PCRA] opinion when it stated that its decision not to conduct further inquiry with respect to this juror was based on its

assessment of her demeanor in responding to the question.[38]  Accordingly, we find no merit to Appellant's claim that counsel was ineffective for not objecting to the "death qualification" of the jury.

Stevens II, 739 A.2d at 521 (emphasis added) (parallel citations omitted).

I previously granted habeas relief on the underlying substantive Witherspoon claim in Stevens III (I did not reach the ineffective assistance claim) and the Court of Appeals affirmed in Stevens IV.  The Supreme Court vacated that portion of the Court of Appeals' decision, and it in turn remanded the case back to me for reconsideration in light of the decision in Uttecht v. Brown, 551 U.S. 1 (2007).  See Stevens V, 288 F.App'x at 6-7.  I have done so and I am persuaded by the Commonwealth's argument that, when the proper deference is accorded to: (1) the trial court's factual finding of bias made during the *voir dire* in question;[39] (2) the

---

[38]  When the trial court reviewed Claim VII in its 1998 PCRA decision, it understandably stated that it could not remember the interchange with Hartling, which had occurred five years earlier, but that when it granted the prosecutor's motion to dismiss her for cause it must have been relying on something emphatic in her demeanor:

> Although we have no specific recollection of Mrs. Hartling and the transcript is incapable of reflecting the tone of her response as well as her demeanor in so responding, had this juror's answer not been emphatic and clearly conveyed her unwillingness to comply with the court's instructions, we would not have sustained a challenge for cause.  As is apparent from the record, we repeatedly asked jurors whether they would be able to set aside their opinions – whatever it might be – and follow the court's instructions.  Moreover, the Commonwealth's immediate challenge for cause, without objection from defense counsel, is corroborative of Mrs. Hartling's adamant position.

(Dkt. 17, App. 26, *PCRA Court Opinion* at 52).

[39]  Deference is owed to the implicit finding of bias the trial court made during the *voir dire* proceeding when it granted the prosecutor's motion to excuse Hartling for cause.  Uttecht, 551 U.S. at 7 (citing Wainwright v. Witt, 469 U.S. 412, 430 (1985) ("*Deference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias*.")).

Pennsylvania Supreme Court's adjudication of this claim in <u>Stevens II</u> under § 2254(d),

<u>see</u> <u>Uttecht</u>, 551 U.S. at 10; and, (3) <u>Strickland</u>'s presumption that counsels' conduct falls within

the wide range of reasonable professional assistance,[40] Stevens is not entitled to habeas relief on

Claim VII.

**1.**

Before denying the petitioner's claim in <u>Uttecht</u>, the Court provided a detailed review of

"the clearly established Federal law, as determined by the Supreme Court of the United States,"

28 U.S.C. § 2254(d)(1), that governs federal habeas review of a state court's adjudication of a

<u>Witherspoon</u> claim.  551 U.S. at 5-9.  <u>Witherspoon</u> was a direct appeal from a criminal

conviction.  During the *voir dire* that preceded Witherspoon's capital trial, the prosecution

succeeded in removing a substantial number of jurors based on their general scruples against

inflicting the death penalty.  The State challenged, and the trial court excused for cause, 47

members of the 96-person venire, without significant examination of the individual prospective

jurors.  <u>Witherspoon</u>, 391 U.S. at 514-15; <u>see</u> <u>also</u> <u>Uttecht</u>, 551 U.S. at 6 (citing brief for

petitioner in <u>Witherspoon v. Illinois</u>, O.T.1967, No. 1015, p. 4).  The Court held that the

systematic removal of those in the venire opposed to the death penalty had led to a jury

"uncommonly willing to condemn a man to die," 391 U.S. at 521, and thus "woefully short of

that impartiality to which the petitioner was entitled under the Sixth and Fourteenth

Amendments," <u>id.</u> at 518.  Because "[a] man who opposes the death penalty, no less than one

who favors it, can make the discretionary judgment entrusted to him by the State," <u>id.</u> at 519, the

Court held that "a sentence of death cannot be carried out if the jury that imposed or

---

[40]  Both Lipecky and co-counsel Phillis participated in the *voir dire.*

65

recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty," id. at 522.  The Court also set forth, in dicta in a footnote, a strict standard for when an individual member of the venire may be removed for cause on account of his or her views on the death penalty.  Id. at 522-23, n. 21.  It held:  "a sentence of death cannot be carried out if the jury that imposed it or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty[.]"  Id. at 522.

In Wainwright v. Witt, 469 U.S. 412 (1985), the Court explained that "Witherspoon is best understood in the context of its facts."  Id. at 418.  The Court noted that in Witherspoon the trial court had excused half the venire – every juror with conscientious objections to capital punishment.  Id. at 416.  Furthermore, the state sentencing scheme under which Witherspoon's sentence was imposed permitted the jury "unlimited discretion in choice of sentence."  Id. at 421.  When a juror is given unlimited discretion, the Court explained, all he or she must do to follow instructions is consider the death penalty, even if in the end he or she would not be able to impose it.  Id.  Rejecting the strict standard found in Witherspoon's footnote, the Court recognized that the diminished discretion now given to capital jurors and the states' interest in administering its capital punishment scheme called for a different standard.  The Court relied on Adams v. Texas, 448 U.S. 38, 45 (1980), which provided the following standard: "[W]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  Witt, 469 U.S. at 424 (internal quotation marks omitted).

The Court in Witt instructed that, in applying this standard, reviewing courts are to accord

66

deference to the trial court.  Deference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias.  Id. at 430.  The judgment as to "whether a veniremen is biased ... is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.  Such determinations [are] entitled to deference even on direct review; the respect paid such findings in a habeas proceeding certainly should be no less." Id. at 428 (internal quotation marks, footnote, and brackets omitted).  The Court further instructed that the trial court's finding of bias may be upheld even in the absence of clear statements from the juror that he or she is impaired because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." Id. at 424-425.  Thus, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State." Id. at 434.

The Uttecht Court explained that the rule of deference was reinforced in Darden v. Wainwright, 477 U.S. 168 (1986).  There, the State had challenged a potential juror, and the defense had not objected to his removal.  Without further questioning from the trial court, the juror was excused.  Id. at 178.  The petitioner argued to the Supreme Court that the transcript of the *voir dire* did not show that the removed juror was substantially impaired because the critical answer he had given was ambiguous.  The Court rejected this argument, stating: "[O]ur inquiry does not end with a mechanical recitation of a single question and answer." Id. at 176.  Even

when "[t]he precise wording of the question asked of [the venireman], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty," the need to defer to the trial court remains because so much may turn on a potential juror's demeanor.  Id. at 178.  The absence of an objection, and the trial court's decision not to engage in further questioning as it had prior to excusing other jurors, supported the conclusion that the juror was impaired.  Id. (emphasis added).

In Gray v. Mississippi, 481 U.S. 648 (1987), the Supreme Court addressed once more a case involving not the excusal of a single juror but rather systematic exclusion.  The State had lodged for-cause or peremptory challenges against every juror who "expressed any degree of uncertainty in the ability to cast ... a vote" for the death penalty, id. at 652, and quickly exhausted all 12 of its peremptory challenges, id. at 653.  The prosecution then challenged a juror who had expressed no opposition to the death penalty and had said many times that she could return a death sentence.  The trial court denied the challenge.  Id. at 654-55.  Arguing that the trial court had erroneously denied certain earlier challenges for cause, and thus had forced the State to waste peremptory challenges, the prosecution sought to reopen those previous challenges.  The trial court refused to do so, but removed the current juror, over objection from the defense.  Id. at 655.  On appeal all of the state judges agreed the juror could not be excused for cause under either the Witherspoon or the Witt standard, but the majority held it was appropriate, under the circumstances, to treat the challenge in question as a peremptory strike.[41]  481 U.S. at 656-57.

---

[41]  In Uttecht, the Court noted that "Gray represents a rare case, however, because in the typical situation there will be a state-court finding of substantial impairment; in Gray, the state courts had found the opposite, which makes that precedent of limited significance to the instant case."  551 U.S. at 9.

The Supreme Court reversed, holding that the juror had been removed for cause and that she was not substantially impaired under the controlling Witt standard.  481 U.S. at 659.  The error was not subject to harmlessness review, and thus the sentence could not stand.  Id.

In Uttecht, the Supreme Court stated that its precedents established, *inter alia*, that:

> [I]n determining whether the removal of a potential juror would vindicate the State's interest [in having jurors who are able to apply capital punishment within the framework state law prescribes without violating the defendant's right], the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.  Id. at 424-34.

> *Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.  Id. at 428; Darden, supra at 178.  Leading treatises in the area make much of nonverbal communication.  See, e.g., V. Starr & M. McCormick, Jury Selection 389-523 (3d ed. 2001); J. Frederick, Mastering Voir Dire and Jury Selection 39-56 (2d ed. 2005).*

551 U.S. at 9-10 (emphasis added) (parallel citations omitted).  Additionally, the Court in Uttecht emphasized that since the passage of AEDPA, the requirement of deference is all the more pronounced:

> *The requirements of [AEDPA], of course, provide additional, and binding directions to accord deference.  The provisions of that statute create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings.  See 28 U.S.C. § 2254(d)(1)-(2); Williams v. Taylor, 529 U.S. 362, 413 (2000).  (O'Connor, J. concurring in part and concurring in judgment).*

Id. at 10 (emphasis added) (parallel citations omitted).

Turning now to the decision in Uttecht itself, in that case the State moved to exclude a potential juror, "Juror Z," for cause after he demonstrated confusion about the conditions under which the death penalty could be imposed and appeared to believe – even after being informed

that parole was not an option – that it was only appropriate when there was a risk of release and recidivism.  The defense stated that it had no objection, and the trial court excluded Juror Z for cause.  Id. at 14-15.  The defendant, Brown, was subsequently convicted and sentenced to death, and the Washington Supreme Court affirmed.  Id. at 5.  Brown filed a federal petition for writ of habeas corpus, arguing that the exclusion of Juror Z for cause violated Witherspoon and its progeny.  The district court denied the petition, but the Court of Appeals for the Ninth Circuit granted it, holding that the state appellate court had not found Juror Z to be substantially impaired and, further, that "the transcript unambiguously proved Juror Z was not substantially impaired."  Id. at 16.

The Supreme Court determined that the court of appeals was wrong on both points and it reversed.  It held that the trial court had made an implicit finding of bias during the *voir dire* and "[i]t is the trial court's ruling that counts":

> [T]he trial court ... is entitled to deference because it had an opportunity to observe the demeanor of Juror Z.  We do not know anything about his demeanor, in part because a transcript cannot fully reflect that information but also because the defense did not object to Juror Z's removal.  Nevertheless, the State's challenge, Brown's waiver of an objection, and the trial court's excusal of Juror Z supports the conclusion that the interested parties present in the courtroom all felt that removing the potential juror was appropriate under the Witherspoon-Witt rule.

Id. at 17-18 (citing Darden, 477 U.S. at 178 (emphasizing the defendant's failure to object and the judge's decision not to engage in further questions as evidence of impairment)).  The Supreme Court faulted the court of appeals for failing to afford the proper level of deference to the trial court, which "is in a superior position to determine the demeanor and qualifications of a potential juror."  Id. at 22.

As the Commonwealth argues, Uttecht provides that the trial court's assessment of a potential juror's demeanor is of primary importance, especially when there is ambiguity in the printed record and regardless of whether the trial court engaged in an explicit analysis regarding substantial impairment.[42]   Additionally, if the defense counsel did not object to the excusal of the prospective juror, that fact is important.  The Uttecht Court observed:

> It is true that in order to preserve a Witherspoon claim for federal habeas review there is no independent federal requirement that a defendant in state court object to the prosecution's challenge; state procedural rules govern.  We nevertheless take into account voluntary acquiescence to, or confirmation of, a juror's removal.  By failing to object, the defense did not just deny the conscientious trial judge an opportunity to explain his judgment or correct any error.  It also deprived reviewing courts of further factual findings that would have helped to explain the trial court's decision.  The harm caused by a defendant's failure to object to a juror's excusal was described well by a Washington appellate court in a different case:

>> "When a challenge for cause is made, opposing counsel can object either on the grounds that it is facially insufficient or that the facts needed to support it are not true.  [Defendant] did neither.  Had [defendant] objected immediately to the State's challenge for cause, the court could have tried the issue and determined the law and facts.  Because [defendant] did not timely object to the excusal of Juror 30, the court had no opportunity to remedy whatever factual questions were in the mind of [defendant's] counsel."  State v. Taylor, No. 16057-2-III etc., 89 Wash.App. 1033, 1998 WL 75648, *5 (Wash.App., Feb. 24, 1998) (unpublished opinion; citations omitted).

The defense may have chosen not to object because Juror Z seemed substantially impaired.  See 451 F.3d, at 959 (Tallman, J., dissenting from denial of rehearing

_____

[42]   When examining the questioning of the potential juror at issue, the federal court must defer to the trial court's interpretation of the record rather than substituting its own.  For example, the trial court in Uttecht concluded that the questioning of Juror Z revealed confusion about the conditions under which the death penalty could be imposed.  The Court of Appeals for the Ninth Circuit interpreted the questioning differently, seizing on Juror Z's assurances that he could follow the law.  The Supreme Court faulted this approach, finding that the court of appeals failed to afford sufficient deference to the "superior position" of the trial court.

en banc). Or defense counsel may have felt that Juror Z, a basketball referee whose stepbrother was a police officer, would have been favorable to the State. See App. 68, 74; 451 F.3d, at 953, n. 9 (reasoning that "defense counsel declined to object because he was glad to get rid of [J]uror Z.  After all, Z had described himself as pro-death penalty .... Defense counsel must have thanked his lucky stars when the prosecutor bumped Z").  Or the failure to object may have been an attempt to introduce an error into the trial because the defense realized Brown's crimes were horrific and the mitigating evidence was weak. Although we do not hold that, because the defense may have wanted Juror Z on the jury, any error was harmless, neither must we treat the defense's acquiescence in Juror Z's removal as inconsequential.

Id.  Finally, federal courts should not review the questioning of a potential juror in a vacuum. Rather, they must review the entire *voir dire*, taking note of the number of challenges for cause, the patterns and practices of the trial judge and the attorneys, and any instructions provided by the trial court to the attorneys and members of the venire.

## 2.

In this case, jury selection followed a guilt phase bench trial, and thus was more streamlined towards the law of capital sentencing.  Prior to jury selection, the trial court met with counsel in chambers to discuss the questions it was going to ask.  (Dkt. 13, App. 2 at 597).  One of the questions it proposed asking was: "Do you have an opinion about the death penalty which would prevent you from following the Court's instructions as to what penalty should be imposed."  (Id.)  Such a question, which incorporated the Witherspoon-Witt standard, illustrates that the trial court understood the requirements of United States Supreme Court precedent prior to commencing *voir dire*, and also that it was prepared from the beginning of *voir dire* to apply the appropriate legal standard.  Cf. Woodford v. Visciotti, 537 U.S. 19 (2002) (per curiam) (a "readiness to attribute error [to the state court] is inconsistent with the presumption that state courts know and follow the law.  It is also incompatible with § 2254(d)'s highly deferential

72

standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.") (internal citations and quotations omitted).

The entire *voir dire* transcript has been reviewed.  It appears that approximately 75 prospective jurors were questioned.  After reviewing the *voir dire* of each of the prospective jurors, I am satisfied that Stevens was not tried before a jury that was improperly death qualified.  Contrary to his suggestion, on many occasions a party would comment on a motion for cause lodged by the other party.  (See, e.g., Dkt. 14, App. 3 at 28-29) (W. Anderson); id. at 65-66, 73 (C. Church); id. at 118-19 (M. Dunlap); id. at 130-31 (H. Gillingham); Dkt. 14, App. 4, 4/23/93 Tr. (10:48 a.m.) at 83-84 (J. Symons); Dkt. 14, App. 4, 4/23/93 Tr. at 85, 87-88 (E. Weiland); Dkt. 14, App. 6 at 23-24, 31-32 (W.Schmidt)).  The court and/or the parties also asked some prospective jurors additional questions about their beliefs regarding the death penalty.  (Dkt. 14, App. 3 at 44-45 (J. Bell); Dkt. 14, App. 4, 4/23/93 at 27-30, 34-36 (K. Lechok); id. at 83-86 (E. Weiland); id. at 89-90, 97-98 (B. Woiz); id. 100-01 (B. Yager); Dkt. 14, App. 6 at 23-24, 31-32 (W. Schmidt); Dkt. 15, App. 8, 4/26/93 (1:43 p.m.) at 22-23 (L. Dusold).  That no one asked Hartling any follow up questions, and that Lipecky and Phillis did not comment at all at the prosecutor's motion to remove her (or another prospective juror that stated he was opposed to the death penalty, J. Perrott), is very telling.

A review of the transcripts also shows that a total of 18 prospective jurors were questioned prior to Hartling.  Five of those jurors – W. Anderson, J. Bell, D. Christian, L. Dicicco, and M.Dunlap – gave, *inter alia*, ambiguous responses to death penalty questions.  (Dkt. 14, App. 3 at 22, 28-29, 44-45, 56, 106, 109-116).  In response, the trial court asked follow-up questions of those prospective jurors, explaining to them the Pennsylvania death

penalty statute and asking them whether they could follow the court's instructions.  Anderson and

Bell were excused for cause, and the remainder were removed by peremptory challenge.

In an effort to explain why Hartling was not asked further questions about the death

penalty, the Court of Appeals in Stevens IV, stated in its Opinion:

> Under these circumstances, we cannot easily attribute the absence of the proper
> colloquy in Hartling's case to something unremembered about her demeanor.
> Indeed, it may be noteworthy that Hartling was the first potential juror, and the
> only juror to do so on the first day of voir dire, who told the trial judge that she
> had more qualms about the death penalty.  This may suggest, if anything, that the
> trial judge's failure to conduct proper follow-up questioning was an oversight,
> although one of constitutional proportions.  The trial judge may simply have not
> yet well-thought out how he would handle a potential juror who expressed moral
> opposition to capital punishment.

187 F.App'x at 8-9.

I respectfully believe that the Court of Appeals would reconsider that position under

Uttecht and now that it has the entire *voir dire* at its disposal.  First, it is belied by the record (the

trial court's meeting in chambers and the questioning of all of the prospective jurors over the

course of the three-day *voir dire*) and also the presumption that state courts know and follow the

law.  Second, the trial court's implicit finding of bias is entitled to deference, and Stevens has not

rebutted it by clear and convincing evidence in the entire *voir dire* transcript.  Moreover, to

dismiss the trial court's implicit finding of bias on the grounds that there is no support for it in the

printed record misses the mark because "a transcript cannot fully reflect that information" and

"the defense did not object to [the juror's] removal."  Uttecht, 551 U.S. at 17-18.  Third, the trial

court and the Pennsylvania Supreme Court, in interpreting its own record, concluded that the

reason no follow-up questions were asked of Hartling was because of her demeanor and adamant

position against the death penalty.  This finding is entitled deference and cannot be simply

disregarded in favor of a federal court's *de novo* interpretation of the record.

In Stevens IV, the Court of Appeals also found that defense counsels' failure to object to Hartling's removal was of little significance because the trial court failed to ask follow-up questions. However, I respectfully believe that it would agree that that reasoning is no longer valid under Uttecht, in which the Supreme Court emphasized the significance of defense counsel's failure to object, explaining how such a failure deprives the trial court of an opportunity to explain its judgment and deprives the reviewing courts of further factual findings to help explain the trial court's decision. As a result, the trial court can hardly be faulted with failing to ask follow-up questions or making belated factual findings in the absence of a timely objection.

Moreover, there is additional evidence in the transcripts to suggest that defense counsel's failure to object was intentional. Immediately following the trial court's ruling, the court reminded counsel of the right to object to a challenge for cause, stating:

> The Court:    If there's an objection for challenge for cause, even though it is not
> at side bar, counsel should raise it so that the Court can rule on it....

(Dkt. 14, App. 3 at 160-61). Defense counsel once again said nothing, leading to the conclusion that Lipecky and Phillis either agreed that Hartling was substantially impaired, or that they did not want her on the jury for some other reason.

Stevens compares the facts of Uttecht to the *voir dire* at issue here, and points out that the questioning of Juror Z in Uttecht was much more extensive than in the present case. That is true, but it is not ultimately persuasive. The lessons of Uttecht are not limited to its facts. In any event, the facts of the present case are actually no less compelling than Uttecht. In Uttecht, the potential juror stated six times that he could consider the death penalty or follow the law. In the

present case, there are no such statements.  In Uttecht, the state courts were silent on the juror's demeanor and whether it played a role in the trial court's decision to exclude him.  In the present case, both the PCRA Court and the Pennsylvania Supreme Court held that the decision to exclude Hartling was based on the "the manner in which" she responded to the court's *voir dire* question.  (Dkt. 17, App. 26, *PCRA Court Opinion* at 52); Stevens II, 739 A.2d at 521.

For all of these reasons, I cannot conclude under AEDPA that Stevens is entitled to habeas relief on his underlying substantive Witherspoon claim (or on a dependant disparate treatment claim that he also makes).  There is no basis to disturb the trial court's finding of bias, and the Pennsylvania Supreme Court's decision was not "contrary to" or "an unreasonable application of" Witherspoon, Witt, Darden, Gray, or any other United States Supreme Court precedent.

This decision takes me to a related claim that Lipecky and Phillis were ineffective for failing to object to Hartling's removal for cause, which is also subject to review under AEDPA.  I must begin with the presumption that their challenged conduct might have been part of a sound strategy.  Clayton Thomas, 428 F.3d at 499-500.  Because in this case "the record does not explicitly disclose trial counsel's actual strategy or lack thereof (either due to lack of diligence on the part of the petitioner or due to the unavailability of counsel), the presumption may only be rebutted through a showing that no sound strategy ... could have supported the conduct." Id. at 500 (citing Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (noting that the strategic presumption "has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive.'") (which quoted Massaro

v. United States, 538 U.S. 500, 505 (2003)).  Stevens has not rebutted that presumption.  The record does not reflect why Lipecky and Phillis did not object, but it cannot be said that no sound trial strategy could have supported their conduct.  One obvious potential strategic reason immediately comes to mind:  she wrote something in her juror questionnaire that made them not want her on the jury.  Therefore, Stevens' ineffective assistance claim has no merit.

Although I deny relief on Claim VII, I will grant Stevens a certificate of appealability on it, as the previous holdings regarding it indicated that one is appropriate.

**B.**

As part of Claim VII, Stevens also contends that the trial court's refusal to grant the defense's challenge for cause on a prospective juror (C. Church) who was allegedly biased in favor of the death sentence was improper.  He also contends  that his counsel was ineffective for not properly "life qualifying" the jury by failing to object to the refusal of the trial court to strike Church for cause, or for failing to challenge the trial court's decision on direct appeal.  As the Pennsylvania Supreme Court explained in Stevens II when it denied this claim:

> The purpose of 'life qualifying' the jury is to ask questions on voir dire that identify prospective jurors who would be unable to consider a sentence of life imprisonment.  Because the prosecutor, through his or her 'death qualifying' questions, is allowed to determine that a juror is capable of sentencing the defendant to death in appropriate circumstances, due process requires that the defendant also be permitted to question prospective jurors to disqualify those who would be incapable of imposing a life sentence regardless of the instructions of the court.  While the court cannot deny the defendant the opportunity to life-qualify the jury, there is no requirement that counsel ask life-qualifying questions.

730 A.2d at 521 (citing Commonwealth v. Morris, 684 A.2d 1037, 1043 (Pa. 1996); Morgan v. Illinois, 504 U.S. 719 (1992); Commonwealth v. Lark, 698 A.2d 43, 48 (Pa. 1997)).

See also Brian Thomas, 570 F.3d at 121-22.

This claim clearly has no merit, especially under the deference this Court must give to the trial court's decision during *voir dire* and the Pennsylvania Supreme Court's subsequent decision denying this claim.  During her *voir dire*, Church testified in the following manner:

> The Court:    Do you have an opinion about the death penalty which would prevent you from following the Court's instruction as to what penalty should be imposed?
>
> A.                  I believe in the death penalty but whatever, I could go by the instructions, whatever the Court —

(Dkt. 14, App. 3 at 63).  She was then rehabilitated and asserted that she would follow the instructions of the court.  Based on that assertion, the trial court denied Lipecky's challenge for cause.  (Id. at 65-66).  Church then expressed the view that she had formed an opinion about the case based on newspaper articles that she had read and that she would be more likely to believe a police officer than a defense witness.  Based on questions from the prosecutor, Church was again rehabilitated, indicating her willingness to follow the court's instructions.  (Id. at 70-73).  Lipecky renewed his challenge for cause, which the court refused.  He then exercised a peremptory challenge.  (Id. at 73-74).

In Stevens II, the Pennsylvania Supreme Court held:

> Here, Appellant argues that the refusal of the trial court to grant his challenge for cause of another prospective juror was erroneous, and that counsel was ineffective for not pursuing this on appeal... Counsel objected to the refusal of the court to strike this juror for cause, and exercised a peremptory challenge.  We find Appellant's claim that counsel was ineffective for not pursuing this matter on appeal is without merit.  The record amply demonstrates that this juror testified that she could set aside her views concerning the death penalty and the credibility of police witnesses and follow the instructions of the court.  Accordingly, the decision of the court to deny the challenge for cause was proper, and we will not find counsel ineffective for failing to pursue a claim that has no merit.

739 A.2d at 522.  It adjudication satisfies review under AEDPA.

78

**Claim VIII    Change Of Venue Or Venire**

**A.**

Before the *voir dire* began on the morning of April 22, 1993, defense counsel presented a motion contending that Stevens would be denied a fair sentencing hearing due to prejudicial publicity unless the trial court granted him a change of venue or venire.  (<u>See</u> Dkt. 14, App. 3 at 2).  Attached to the motion were newspaper articles that had reported on the murders when they occurred (in and around February 1992), as well as recent articles that reported on the guilt phase of the trial (in and around late April 1993).  (<u>Id.</u>)  The argument for change of venue focused primarily upon the alleged prejudice that was engendered in the community because of the media reporting that Stevens had killed an off-duty police officer (Love).  (<u>Id.</u> at 5).  The trial court denied the motion.  It determined that the newspaper reporting was not inflammatory *per se* and that an impartial jury could be selected from Beaver County.  The court said it would question the prospective juror as to whether they had been exposed to media coverage of the murders and whether they had a fixed opinion as to the penalty to be imposed, and that it would reconsider the motion if the prospective jurors' answers indicated that an unbiased jury could not be selected. (<u>Id.</u> at 4-5).

Defense counsel renewed the motion on Monday, April 26, 1993, before questioning began of the prospective jurors that had been subpoenaed that Saturday at the Beaver Valley Mall.  (Dkt. 14, App. 6 at 59-62).  Counsel asserted that the second panel of prospective jurors was exposed to the recent reporting on Stevens' case and would not have been instructed (as the first panel had been) to disregard the news coverage of the case that had occurred during the previous week.  (<u>Id.</u>)  The trial court denied the motion.  (<u>Id.</u> at 62).

79

In Claim VIII, Stevens contends that the trial court's decision denied him the right to an impartial jury.  He raised this same claim in his direct appeal.  The Pennsylvania Supreme Court rejected it on the merits in Stevens-1, 670 A.2d at 625-27.  It first noted that the determination of whether to grant a change of venue or venire rests within the sound discretion of the trial court and that that court's decision would not be disturbed on appeal absent an abuse of that discretion. Id. at 625 (citing Commonwealth v. Buehl, 508 A.2d 1167 (Pa. 1986)).  It then held that the news coverage of the case "was not inherently prejudicial because it was factual and objective," and it denied this claim.  Id. at 626-27.

**B.**

The due process clause of the Fourteenth Amendment guarantees a criminal defendant the right to "a trial by an impartial jury free from outside influences."  Sheppard v. Maxwell, 384 U.S. 333, 362 (1966); see also Irvin v. Dowd, 366 U.S. 717, 722 (1961); Rideau v. Louisiana, 373 U.S. 723 (1963); Estes v. Texas, 381 U.S. 532 (1965); Murphy v. Florida, 421 U.S. 794 (1975); Patton v. Yount, 467 U.S. 1025 (1984).  As these cases hold, when prejudicial pretrial publicity wholly undermines the impartiality of the jury, the trial court should take steps to assure a fair trial  granting a change of venue or venire.  Sheppard, 384 U.S. at 363; Rideau, 373 U.S. at 723.

In some cases, adverse pretrial publicity is so extreme that the court will presume prejudice to the defendant.  Irvin, 366 U.S. at 723; Patton, 467 U.S. at 1031.  "Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those

who served as the defendant's jurors."  Rock v. Zimmerman, 959 F.3d 1237, 1252 (3d Cir. 1992),

*overruled on other grounds* Brecht v. Abrahamson, 507 U.S. 619 (1993); see also Sheppard, 384

U.S. at 333; Rideau, 373 U.S. at 723.  Such cases, however, are "exceedingly rare."  Rock, 959

F.3d at 1253; Flamer v. Delaware, 68 F.3d 736, 754 (3d Cir. 1995).  In fact, for a court to

presume prejudice, "the community and media reaction. . . must have been so hostile and so

pervasive as to make it apparent that even the most careful *voir dire* process would be unable to

assure an impartial jury."  Rock, 959 F.3d at 1252.

In the absence of facts that demonstrate a presumption of prejudice, a petitioner must

prove actual prejudice, that is, that those who served on his jury could not reach an impartial

verdict based solely on the evidence presented at trial.  Patton, 467 U.S. at 1035 (citing Irvin, 366

U.S. at 723); Rock, 959 F.2d at 1253.

> It is not required . . .that jurors be totally ignorant of the facts and issues involved.
> In these days of swift, widespread and diverse methods of communication, an
> important case can be expected to arouse the interest of the public in the vicinity,
> and scarcely any of those best qualified to serve as jurors will not have formed
> some impression or opinion as to the merits of the case.  This is particularly true
> in criminal cases.  To hold that the mere existence of any preconceived notion as
> to the guilt or innocence of an accused, without more, is sufficient to rebut the
> presumption of a prospective juror's impartiality would be to establish an
> impossible standard.  *It is sufficient if the juror can lay aside his impression or
> opinion and render a verdict based on the evidence presented in court.*

Irvin, 366 U.S. at 722-23 (emphasis added).  To determine whether actual prejudice exists, the

court should look to the totality of the circumstances, including the voir dire of the jury.  Murphy,

421 U.S. at 799-801.

The Pennsylvania Supreme Court's decision denying Claim VIII was neither "contrary to"

81

nor "an unreasonable application of" the above-cited law.  28 U.S.C. § 2254(d).[43]  Stevens takes

issue with its decision because he argues that the radio, television, and local newspaper coverage

of his trial was so pervasive and inflammatory that prejudiced should have been presumed.[44]  He

has presented no evidence to support this contention.  He has given no detail whatsoever

regarding the radio and television coverage of his case.  The only specific support that he

provides regarding the newspaper coverage are brief summarizations[45] of the following articles

from the Beaver County Times:

- "… the headline [from an article published on] April 21, 1993 stated that Stevens 'informed state police that he did the killings.'  The article described in vivid detail the testimony of the witnesses [that testified during the guilt phase of the trial].  This article referred to decedent Mike Love as an off-duty policy officer."

- "The headline on April 22, 1993 stated 'Stevens Verdict: Guilty of Murder' and again reiterated details.  This article referred to 'Reverend Love,' brother of decedent Mike Love, who characterized the deceased sympathetically."

- "On the evening of Friday, April 23, 1993, the headline … was '14 Jurors to Decide Stevens' Fate.'"

---

[43]  In rejecting this claim, the Pennsylvania Supreme Court applied the correct rule of law from United States Supreme Court precedent.  It relied on Commonwealth v. Bachert, 453 A.2d 931 (Pa. 1982), Commonwealth v. Pursell, 495 A.2d 183 (Pa. 1985), and Commonwealth v. Casper, 392 A.2d 287 (Pa. 1978) – state cases that properly recognized Irvin, Rideau, Sheppard, and Murphy as setting forth the guiding principles for claims concerning prejudicial pretrial publicity.

[44]  Stevens does not appear to be contending that he can demonstrate "actual prejudice."  Such a contention would be denied.  To show the existence of actual prejudice, Stevens must satisfy two basic prerequisites.  First, he must show that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at the sentencing hearing, that the defendant should be sentence to death.  See Irvin, 366 U.S. at 727.  Second, he must show that these jurors could not have laid aside these preformed opinions and rendered a decision "based on the evidence presented in court."  Id. at 723.  These prerequisites are not present.

[45]  The articles upon which Stevens relies are not contained in the state court record submitted to this Court and Stevens has not supplemented the record to include them.

- "On Sunday, April 25, 1993, [the] headline read 'Went to Mall Saturday? Surprise, You're a Juror.'  This article clearly stated that the people who had been ordered to report to court by the sheriff's deputies on Monday, April 26, 1993 would be reporting for the express purpose of potential selection for the sentencing jury in [Stevens'] case."

(Dkt. 7, ¶¶ 175-77).  These summarizations fall far short of establishing that there was a "trial atmosphere ... utterly corrupted by press coverage," Murphy, 412 U.S. at 799, that the United States Supreme Court has required before attaching a  presumption of prejudice.  Therefore, Stevens has failed to show that his was one of those "exceedingly rare" cases, Rock, 959 F.2d at 1252, where "the community and media reaction … [was] so hostile and so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury."  Id.

A review of the jury *voir dire* also confirms the trial court's conclusion that a jury selected in Beaver County was capable of impartially determining Stevens' sentence.  It appears that only three of the prospective jurors questioned were dismissed for cause because they had a fixed opinion about punishment as a result of the media coverage.  (Dkt. 14, App. 3 at 23-27 (W. Anderson); Dkt. 14, App. 4, 4/23/93 at 115-18 (V. Benedict); Dkt. 14, App. 6 at 75-76 (M. Krupa)).  Some of the prospective jurors indicated that they had not read, or had little memory of, the media reporting of the case.  Many others indicated that although they had read about the murders in the papers at the time of the incident and/or in more recent articles about the guilt-phase of the trial, they had not formed a  fixed opinion about the penalty to be imposed and could be impartial.  In fact, so many of the prospective jurors stated that they could be fair and impartial that the defense did not even exhaust all of its peremptory challenges.

**Claim IX       Evidence Of Stevens' Relationships With Other Women**

**A.**

Stevens claims that the Commonwealth improperly introduced during its case-in-chief evidence of his relationships with other women.  Notably, he has failed to specify in any of his submissions filed with this Court which of the Commonwealth's witnesses provided the alleged objectionable testimony.  This Court had to look to his state-court filings to find the answer.  There, he cited to testimony given by Gary Luikart, Linda Paninsky, and Renee Frank.  Luikart testified that a woman name "Sue" lived with Stevens in the weeks prior to the murders.  (Dkt. 15, App. 7 at 5-6).  He also testified that Stevens dated other women during separations from Brenda Jo and that he had seen Stevens dance with other women.  (Id. at 8, 18-20).[46]  Paninsky testified that she "periodically" saw Stevens dancing with other women (id. at 93), and Frank testified that she saw him dance with other women "a few times."  (Id. at 121).[47]

In Claim IX, Stevens argues that the above-cited testimony was inadmissible in the Commonwealth's case-in-chief because it was not relevant to a statutorily-defined aggravating circumstance.[48]  He contends that the alleged erroneous admission of this evidence violated his

---

[46]  During cross-examination, Luikart stated that Stevens told him that he shot the victims because they were dancing in a sexually explicit manner.  (Dkt. 15, App. 7 at 15-16).  In redirect, the prosecutor asked Luikart whether he had ever seen Stevens dance with other women.  Defense counsel objected to the question as beyond the scope of cross examination.  The prosecutor responded that since the defense elicited testimony regarding similar behavior by Brenda Jo, it was fair to inquire into whether Stevens had engaged in the same type of conduct for which he killed her.  The court permitted the question.  (Id. at 18-20).

[47]  Another Commonwealth witness, Kelly Eaton, apparently was asked whether she had seen Stevens dance with other women.

[48]  At the time of the sentencing hearing, 42 Pa.Cons.Stat. § 9711(a)(2) (West 1993), provided: "In the sentencing hearing, evidence may be presented as to any matter that the court

federal constitutional rights because it improperly interjected into his case a non-statutory aggravating circumstance (that is, that the jury should sentence him to death because he engaged in relations with women other than his estranged wife).  He also asserts that his counsel was ineffective for failing to object.[49]

The Pennsylvania Supreme Court rejected Claim IX.  It concluded that the evidence was not introduced for the reasons suggested by Stevens.  Stevens II, 739 A.2d at 522.  Rather, it was introduced to rebut his anticipated mitigation case.  Id. ("The Commonwealth offered this testimony to rebut [Stevens'] explanation that he had shot his wife when he witnessed her dancing with Love.").  It also held that Stevens suffered no prejudice.  Id.

**B.**

Stevens asserts that this Court should reject the Pennsylvania Supreme Court's rationale as "illogical" because he had not yet presented his mitigation case and therefore the prosecution

---

deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e).  Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d)."

In Commonwealth v. Hughes, 865 A.2d 761 (Pa. 2004), a case upon which Stevens relies to show that the evidence at issue was admitted in violation of state law, the Pennsylvania Supreme Court held that the trial court had erred when it made a pretrial ruling that permitted the Commonwealth to introduce at a capital sentencing hearing evidence of a juvenile assault committed by the defendant.  It determined that the evidence was not admissible either *to rebut the defendant's mitigating circumstances*, id. at 793-96, or as evidence to support any aggravating circumstance.  Therefore, the Pennsylvania Supreme Court concluded, the evidence was inadmissible under § 9711(a)(2).  Hughes, 865 A.2d at 793-98.  Hughes is distinguishable from Stevens' case because at his sentencing hearing the evidence at issue (his relationships with other women) was admissible because it tended to rebut two of his mitigating circumstances.

[49]  As discussed *infra*, in a weighing state such a Pennsylvania, "there is Eighth Amendment error when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision to impose a death sentence."  Sochor v. Florida, 504 U.S. 527, 532 (1990).

could not have been offering rebuttal evidence.  He claims that the only purpose for which the prosecution could have admitted the evidence was to establish a non-statutory aggravating circumstance.

Stevens' arguments are unconvincing for several reasons.  First, if there was any error, it was only one of state law for which this Court can grant no relief.  See, e.g., Estelle, 502 U.S. at 67-68.  Stevens' contention that his federal constitutional rights were violated because the evidence improperly introduced a non-statutory aggravating circumstances is not supported by the record, which shows that the Commonwealth utilized the evidence to attempt to disprove two of his mitigating circumstances.[50]

---

[50]  Specifically, the Commonwealth asserted that Stevens' relationships with other women undercut his contention that the jury should find the "catch-all" mitigating circumstance at § 9711(e)(8).  In its closing, the prosecutor argued:

> [In his testimony, Stevens] portrayed himself as a long-suffering husband while [Brenda Jo] on the other hand is unfaithful. [Stevens] characterizes himself from the beginning to the end as a victim, more victimized than aggressive, more sinned against than sinning.... And while he says his wife's morality is something less than desirable, the fact of the matter is that in February of 1992 it was he who was living with another woman at his residence.... And although [Stevens] wants to characterize himself as an individual who is overly distraught at his wife's separation from him, it is he who is a regular at Armando's, it's he who is seen by a barmaid, by several barmaids[,] dancing with other women on other occasions.

(Dkt. 31, App. 6, 4/29/93 Tr. at 10-11, 12).

The Commonwealth also relied upon the evidence of Stevens' relations with other women to discredit his contention that the jury should find § 9711(e)(2)'s mitigating circumstance (that when he killed he was under the influence of extreme mental or emotional disturbance brought on by seeing his wife dance with another man). The prosecutor argued:

> Doctor Altman [testified] that this man is a loner, that he's not adaptable to society, but we heard testimony from character witness after character witness that [Stevens] put[] on the stand, three of them, of a very long, good, honorable working history where he had responsibility, where he was required to be well-

Second, any error was harmless.  The evidence was relevant because it tended to disprove the defense mitigation case and it would have been admissible in the Commonwealth's rebuttal case.[51]  Its introduction during the Commonwealth's case-in-chief did not have a "substantial and injurious effect" on the jury's deliberations.  See, e.g., Kindler v. Horn, 542 F.3d 70, 89 (3d Cir. 2008), *vacated on other grounds sub. nom.* — U.S. — , 130 S.Ct. 612 (2009).  Any error was harmless for the additional reason that Stevens has not shown that the jury considered and weighed the evidence as an aggravating circumstance, or that it is even reasonably likely that it did.  The trial court specifically instructed the jury that, with respect to Brenda Jo's murder, the only two aggravating circumstances that were applicable were those set forth at § 9711(d)(7) & (d)(11).  With respect to Love's murder, it instructed that the jury could also consider whether the torture aggravator,  id. § 9711(d)(8), had been established.  The law presumes that the jury followed the instructions given and that it considered only the statutory aggravating circumstances outlined by the trial court.  See, e.g., Kindler, 542 F.3d at 89 ("We presume that the jury followed these instructions [regarding the applicable statutory aggravating

---

socialized, where he operated forklifts, supervised people, was a subforeman, made friends, was good with customers, he was a regular at Armando's, he had friends and acquaintances there, he danced with women, called Caroline Dickson and made a date [with] her the next day, he was living with a woman.  Does this sound like a loner?  He wasn't a loner and he wasn't suicidal.  And his psychiatrists are just one more excuse.

(Id. at 21-22).

[51]  Brecht v. Abrahamson, 507 U.S. 619 (1993), describes the harmless error analysis applicable in federal habeas.  It requires that in order to grant habeas relief a federal court must find that a trial error had a "substantial and injurious effect or influence in determining the jury's verdict."  Id. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  See also Fry v. Pliler, 551 U.S. 112 (2007).

circumstances], and therefore we must conclude that the jury would have sentenced Kindler to death whether or not the improper argument was presented.") (citing <u>Richard v. Marsh</u>, 481 U.S. 200, 206 (1987) (stating the "almost invariable assumption of the law that jurors follow their instructions.")).  <u>See</u> <u>also</u> *infra*, discussing and dismissing similar contentions Stevens makes in Claim XI).

Third, the actual issue presented by this claim is whether the *timing* of the admission of the evidence violated Stevens' federal constitutional rights.  The Court of Appeals addressed this same issue in <u>Frey v. Fulcomer</u>, 974 F.2d 348 (3d Cir. 1992) and rejected it.  In that case, the prosecution called a witness during its penalty phase case-in-chief who testified that the defendant had told her that he would kill his wife if he could get away with it.  <u>Frey</u>, 974 F.2d at 353.  The testimony was not offered as evidence to support an aggravating circumstance.  Rather, the trial court permitted the Commonwealth to present it during its case-in-chief to *counter the defendant's expected mitigation case* (that he had been coerced and influenced by a co-conspirator).  <u>Id.</u> at 353, 356-58.  In his federal habeas petition, Frey claimed, as Stevens does here, that the admission of rebuttal testimony at that stage of the sentencing hearing was premature and improper because it was not relevant to an aggravating circumstance and because he had yet to put on his mitigation case.  Frey also argued, as Stevens does here, that the admission of the evidence was highly prejudicial because it interjected a non-statutory aggravating circumstance into the case.  <u>Id.</u> at 356-57.

In denying habeas relief in <u>Frey</u>, the Court of Appeals first observed that the evidence was not used to improperly establish a non-statutory aggravating circumstance.  As in this case, the evidence at issue in <u>Frey</u> was admissible under § 9711(a)(2) because it tended to disprove a

mitigating circumstance claimed by the defense.  Id. at 357.   The court next considered and rejected Frey's contention that state law prohibited the introduction of such evidence during the Commonwealth's case-in-chief, observing:  "Nothing in the statute [§ 9711(a)(2)] says that the Commonwealth's case-in-chief may only prove aggravating circumstances and that it must save for rebuttal its disproof of mitigating circumstances that the defense is obviously going to present and argue."  Id.  Moreover, even if it could be said that the timing of the admission of the evidence raised a question under state evidentiary law, the Court of Appeals emphasized that it did not follow that Frey's due process rights were impacted.  Id.  In order to establish a due process violation (as opposed to a violation of state law), Frey had to show that the admission of the witness's testimony resulted in a *fundamentally unfair trial*, meaning the evidence's probative value was so outweighed by its inflammatory content that it violated his constitutional right to a fair trial.  Id. (citing Lesko v. Owens, 881 F.2d 44, 50-52 (3d Cir. 1989)).[52]  Frey could not meet this demanding standard, id. at 357-58, and neither can Stevens in this case.   He does not argue, and I cannot conclude, that the probative value of the evidence of his relationship with other women was so greatly outweighed by prejudice to him that he was denied a fundamentally fair trial.

In conclusion, neither the fact nor the timing of the admission of evidence regarding Stevens' relationships with other women violated his federal constitutional rights.  Prior counsel

---

[52]  The Court of Appeals has defined due process violations arising out of the admission of evidence as follows: "When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law." Bisaccia v. Attorney General of New Jersey, 623 F.2d 307, 313 (3d Cir. 1980) (quotations omitted).  "[O]nly if the inflammatory nature of [the evidence] so plainly exceeds its evidentiary worth, will we find that a constitutional error has been made."  Lesko, 881 F.2d at 52.

were not ineffective for failing to litigate this claim, and the Pennsylvania Supreme Court's decision rejecting it was not "contrary to" or "an unreasonable application of" "clearly established Federal law."  28 U.S.C. § 2254(d)(1).


**Claim X          Reasonable Doubt Instruction**

The Pennsylvania capital sentencing statute places upon the Commonwealth the burden of proving aggravating circumstances beyond a reasonable doubt.  42 PA.CONS.STAT. § 9711(c)(1)(iii).  In Claim X, Stevens asserts that the trial court should have instructed the jury that it had to find each element of each aggravating circumstance.  According to him, the reasonable doubt instructions that the trial court gave were "meaningless because the jury was not also instructed on what the Commonwealth was required to prove beyond a reasonable doubt.  A reasonable doubt instruction – alone – is not constitutionally sufficient."  (Dkt. 7 at 79 n.14).  He argues that his Eighth and Fourteenth Amendment were violated, and that his counsel were ineffective for failing to object.  Stevens raised this same claim in his PCRA proceeding and the Pennsylvania Supreme Court denied it on the merits.  Stevens II, 739 A.2d at 526.  Its decision stands under AEDPA.

Trial courts are free to provide juries with a definition for reasonable doubt.  See, e.g., Victor, 511 U.S. at 5.  "[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof."  Id. (internal citations omitted).  A reviewing court's task is to determine "whether there is a reasonable likelihood that the jury understood the instructions to allow [a finding of the aggravating circumstances] based on proof insufficient to meet" the reasonable doubt standard.  Id. at 6 (citing Estelle, 502 U.S. at 72); see

also Boyde, 494 U.S. at 380.

The instructions given by the trial court regarding the Commonwealth's burden of proof were in accordance with this law.  At the start of the penalty phase, it gave the jury preliminary instructions on the burden of proof, stating:  "*Aggravating circumstances must be proven by the Commonwealth beyond a reasonable doubt* while mitigating circumstances must be proven by the defendant by a preponderance of the evidence."  (Dkt. 31, App. 6, 4/26/93 Tr. at 5 (emphasis added)).  When it gave its instructions at the conclusion of the trial, the court at several points explained to the jury that the Commonwealth had the burden of proving aggravating circumstances beyond a reasonable doubt.  When it discussed direct and circumstantial evidence, the trial court explained:

> [B]efore you may find aggravating circumstances to exist all of the pieces of circumstantial evidence when considered together must convince you of the aggravating circumstances beyond a reasonable doubt.... When I instruct you on aggravating circumstances you will note that in part they involve the defendant's intent or defendant's knowledge.… You may conclude that the defendant had the necessary intent or the necessary knowledge based on circumstantial evidence alone but only if the circumstantial evidence is strong enough to convince you that the Commonwealth has established that intent or that knowledge beyond a reasonable doubt.

(Dkt. 31, App. 6, 4/29/93 Tr. at 59-61).  At the beginning of its discussion on aggravating and mitigating circumstances, the trial court explained once again that "[t]he Commonwealth must prove any aggravating circumstance beyond a reasonable doubt[,]" and then provided a detailed definition of what constitutes reasonable doubt.  (Id. at 62-63).  The trial court then began discussing the aggravating circumstances applicable to the murder of Brenda Jo and reiterated that "in connection with the death of Brenda Jo Stevens only the following matters if proved to your satisfaction beyond a reasonable doubt can be aggravating circumstances."  (Id. at 63).  At

the end of its instructions, the trial court twice told the jury to "remember, the Commonwealth must prove any aggravating circumstance beyond a reasonable doubt[.]"  (Id. at 71, 73).

Thus, the trial court instructed the jury numerous times that the Commonwealth had to prove aggravating circumstances beyond a reasonable doubt.  The Constitution requires nothing beyond that which was given, and Stevens' prior counsel were not ineffective for failing to raise a meritless objection to the instructions.

**Claim XI      The Jury's Alleged Consideration Of Non-Statutory Aggravating Circumstances**

Similar to the contention Stevens makes in Claim IX, in Claim XI he asserts that the Commonwealth improperly invited the jury to consider three non-statutory aggravating factors – (1) his future dangerousness; (2) his lack of remorse; and (3) victim-impact evidence (that is, the effect the murder had on he and Brenda Jo's daughter, Karen).[53]  He argues that the jury's exposure to, and purported consideration of, these non-statutory aggravating circumstances so undermined the weighing process set forth under Pennsylvania law that his federal constitutional rights were violated.  Stevens further asserts that his counsel were ineffective for failing to object or request a cautionary instruction.

The Pennsylvania Supreme Court rejected Claim XI.  Stevens II, 739 A.2d at 527-28.  I am not persuaded by his assertion that its decision was "contrary to" and "an unreasonable application of" Clemons v. Mississippi, 494 U.S. 738, 752 (1990); Sochor v. Florida, 504 U.S.

---

[53]  In 1995, 42 PA.CONS.STAT. § 9711(a)(2) was amended to provide: "In the sentencing hearing, evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible."  See Act of Oct. 11, 1995, P.S. 1064, No. 22, (Spec.Sess. No. 1), § 1.

527, 532 (1990); Espinoza v. Florida, 505 U.S. 1079, 1081 (1992); Richmond v. Lewis, 506 U.S.

40, 46 (1992); and Stringer v. Black, 508 U.S. 222, 231 (1992), which stand for the general

proposition that in a weighing state, such a Pennsylvania, "there is Eighth Amendment error

when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision

to impose a death sentence." Sochor, 504 U.S. at 532; Espinosa, 505 U.S. at 1081 ("Our cases

establish that, in a State where the sentencer weighs aggravating and mitigating circumstances,

the weighing of an invalid aggravating circumstances violates the Eighth Amendment.").[54]

This case is readily distinguishable from those cases.  In each of them, there was *no*

*question* that the sentencer had considered and had given weight to an invalid aggravating

circumstance.[55]  In contrast, Stevens merely speculates that the jury must have considered an

_____

[54]  In Brown v. Sanders, 546 U.S. 212, 220-21 (2006), courts were directed to be guided
by the rule that an invalidated sentencing factor will render the sentence unconstitutional by
reason of its adding an improper element to the aggravation scale in the weighing process unless
one of the other sentencing factors enables the sentencer to give aggravating weight to the same
facts and circumstances.

[55]  In Clemons v. Mississippi, 494 U.S. 738 (1990) and Stringer v. Black, 503 U.S. 222
(1992), the jury was instructed to consider, and found, the statutory aggravating circumstance
that the murder was "especially heinous, atrocious, or cruel" (or some variation thereof).
Similarly, in Espinosa v. Florida, 505 U.S. 1079 (1992), the jury found that aggravator and
recommended that the trial court find it as well, which it did. In Richmond v. Lewis, 506 U.S.
528 (1992), the trial court was the sentencer, and it found the statutory aggravating circumstance
that the murder was "especially heinous, atrocious, or cruel."  After each of these sentencing
proceedings, the "especially heinous, atrocious, or cruel" statutory aggravating circumstance
became invalid in light of Maynard v. Cartwright, 486 U.S. 356 (1988) (see *supra* Claim IV).
Thus, in the cases cited by Stevens, the sentencer unquestionably considered an invalid
aggravating circumstance.

The same thing occurred in Sochor v. Florida, 504 U.S. 527 (1992).  In that case, the trial
court weighed the statutory aggravating circumstance that the killing was "committed in a cold,
calculated and premeditated manner, without any pretense of moral or legal justification" in its
sentencing deliberations.  On direct appeal, the state appellate court determined that the evidence
was insufficient to support the trial court's reliance upon that aggravating circumstance, but

invalid non-statutory aggravating circumstance because some evidence or argument regarding the three factors he cites may have presented at his hearing.  His argument is unconvincing, particularly in light of the instructions given to the jury.  As I observed in my disposition of Claim IX, the trial court specifically instructed the jury what it could consider as an aggravating circumstances, and the law presumes that the jury followed the instructions given.  See, e.g., Kindler, 542 F.3d at 89.  Thus, I cannot conclude that the jury improperly considered as a non-statutory aggravating circumstance any of the three factors at issue in this claim, or that it is even reasonably likely that it did.  For this reason alone, Claim XI fails.

In actuality, Stevens is attempting to convert a mere state law claim that some allegedly irrelevant evidence was introduced or that some allegedly improper argument by the Commonwealth was presented, into a federal constitutional claim.  But if there was any error here (and Stevens has not established that there was), it was not of constitutional magnitude.  The Pennsylvania Supreme Court's decision certainly was not "contrary to" or "an unreasonable application of" any of the United States Supreme Court cases upon which he relies, because those cases are not analogous to his.  (See *supra* footnote 55).

Finally, I cannot end my discussion of this claim without noting that the Pennsylvania Supreme Court determined that the Commonwealth did not improperly put forward Stevens' future dangerousness, Stevens II, 739 A.2d at 528, and I agree with that assessment even under a *de novo* review for the reasons that are discussed in detail in my analysis of Claim XIV.  As for

---

upheld the defendant's sentence because, *inter alia*, the trial court had found three other valid aggravating circumstances.   Id. at 530-32.  The Supreme Court reversed, holding that an Eighth Amendment error occurred because the trial court had weighted an aggravating circumstance that was invalid (since it was supported by insufficient evidence).  Id. at 538-39.

Stevens' contention that the jury improperly considered victim-impact evidence, that contention

is based upon one question the prosecutor asked Karen on cross-examination – whether she had a

good relationship with and missed her mother.  In response, Karen stated she "miss[ed] her a lot."

(4/29/93 Trial Tr. at 12).  This "passing reference to [Brenda Jo's] relationship with her daughter

during cross-examination[,]"  Stevens II, 739 A.2d at 529, did not impact Stevens' federal

constitutional rights.  And, although I do not disagree with Stevens' contention that there was

testimony and argument concerning his lack of remorse, there was hardly any federal

constitutional violation.  For one thing, Stevens has not shown that the evidence was

inadmissible or that the argument regarding it was improper.  For another, the defense opened the

door to the topic when Karen was asked on direct examination if her father had ever told he was

sorry.[56]  She testified that he told her so after he was convicted, and the Commonwealth sought to

---

[56] During Karen's direct examination by defense counsel, she testified that she had not visited her father in jail for several months because it had been too difficult for her to see him. She decided to visit him after his conviction and just prior to his sentencing hearing, and during that meeting, she testified, he told her that he was sorry and ashamed.  (4/29/93 Trial Tr. at 6-7). On cross-examination, the prosecutor attempted to show that Stevens did not display remorse until *after* he had been convicted of double murder, and therefore his remorse was illusory and the product of his fear of being sentenced to death.  To make this point, the prosecutor asked Karen whether it was fair to say that she had not visited her father in the months leading up to his trial because he would not tell her that he was sorry.  Karen confirmed that that was the reason she had not visited her father.  (Id. at 8-9).  In her closing argument, the prosecutor noted several times that Stevens never expressed remorse committing the murders.  (Dkt. 31, App. 6, 4/29/93 Tr. at 22-23, 34).  She stated:

The defendant then had his daughter testify and asked you for mercy.  This man has seen his daughter two times since February 8, 1992.  Three months after the event he tells her he's completely without remorse.  She tells me and the police he wasn't sorry a bit and that he was only concerned with himself.  Today after he's been found guilty of first degree murder, not once but twice, and while in the middle of a life and death sentencing hearing he tells her something completely different.  She is to be pitied, there is no question about that…. But the defendant has offered her to you as another excuse.  Why did the defendant never shed an[y]

exploit the belatedness of Stevens' statement to Karen   to rebut his mitigation case.  There is no

showing that the jury's exposure to some testimony and argument regarding lack of remorse

skewed its weighing process in a manner that amounted to a violation of Stevens' federal

constitutional rights, much less that the Pennsylvania Supreme Court's decision was "contrary to"

or "an unreasonable" application of United States Supreme Court law, for all of the reasons set

forth above.


**Claim XII      Instruction On Mitigating Factors**

As part of its instruction to the jury regarding aggravating and mitigating circumstances,

the trial court stated that "[t]he Sentencing Code defines aggravating and mitigating

circumstances.  [These] are things that make a first degree murder case either more terrible or

less terrible."  (Dkt. 31, App. 5, 4/29/93 Tr. at 62).[57]  In Claim XII, Stevens argues that this

---

tear himself for his wife or Mike Love on the witness stand?  Because if you listen
to the defendant's response he was too busy crying for himself.  Why did he never
show remorse?  He told Gary Luikart… when Gary said to him, "Why did you do
this?"  He said, "I feel at peace."  He told us directly himself from the witness
stand that he felt like a load of bricks were taken from his shoulders.  When asked
directly by his lawyer how he felt when he saw the body of his wife he said he felt
pity for himself and what he had put up with for 27 years.  When I asked him how
[he] felt when he saw the body of Mike Love he says, "I don't know, I never
looked."

(Id. at 22-23).  In discussing the aggravating circumstance of torture with regard to Love's
murder, the prosecutor reminded the jury that Stevens had expressed no remorse for killing Love.
(Id. at 34).  Lipecky countered in the defense closing that Stevens' mental health disorders made
him incapable of showing remorse.  (Id. at 44).

[57]  In the instructions that the trial court gave at the beginning of the sentencing hearing, it
similarly stated:

Now, the sentence that you impose will depend on whether you find any of the

96

instruction improperly focused the jury's deliberations on how "terrible" his "case" was, thereby diverting it from considering his moral culpability and giving full effect to his mitigating evidence.  He claims this was a violation of the Eighth Amendment.  He also claims that his counsel was ineffective for not objecting and not litigating the alleged error on direct appeal. The Pennsylvania Supreme Court denied these claims in Stevens II, 739 A.2d at 526-27, and its adjudication easily survives federal habeas review under AEDPA, 28 U.S.C. § 2254(d).

Considered in the context of the instructions as a whole, Stevens has not shown that there is a reasonable likelihood that the jury applied the challenged instructions in a way that violates the Constitution.  See, e.g., Estelle, 502 U.S. at 72; Boyde, 494 U.S. at 380.  There was no error in the language he challenges.  It did not divert the jury from focusing on his personal culpability to whether his case was "terrible."  The trial court merely was explaining generally the role of mitigating and aggravating factors in a capital case as it introduced those concepts to the jury.

Additionally, when it instructed on mitigating circumstances, the trial court told the jury it was to consider, inter alia, "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offenses."  (Dkt. 31, App. 5, 4/29/93 Tr. at 68).  It further instructed:

> In considering mitigating circumstances you are allowed to consider any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offenses and any other evidence you would consider mitigating including the testimony as to the defendant's reputation for being a

---

things that the Pennsylvania Sentencing Code calls aggravating or mitigating circumstances.  Loosely speaking, aggravating circumstances are things about the killing and the killer which make a first degree murder case more terrible and deserving of the death penalty.

(Dkt. 31, App. 6, 4/26/93 Tr. at 4-5).

truthful, honest, dependable person.

(Id.)  Thus, the trial court's instruction as a whole conveyed to the jury that it was to consider any aspect of the defendant's character, background, or record that could justify imposing a life sentence.

**Claim XIII     Forensic Testimony Describing Brenda Jo's Injuries and Cause Of Death**[58]

At the sentencing hearing, the Commonwealth presented the testimony of Dr. James Smith, the forensic pathologist who performed the autopsies on the victims.  Defense counsel objected to Dr. James testifying about Brenda Jo's injuries and the cause of her death.  (Dkt. 15, App. 8, 4/28/93 Tr. at 2-5).  The trial court overruled the objection and Dr. Smith provided detailed testimony about the subject matter.  (Id. at 5-12).

Stevens challenges the trial court's ruling.  He claims that Dr. Smith's testimony regarding Brenda Jo was "non-probative" because the defense did not contest the aggravating circumstance at § 9711(d)(11) (that is, with respect to the sentence to be imposed for Love's murder, that Stevens had been convicted of another murder) and because the Commonwealth was not asserting, as it was with Love, that she was tortured (the aggravating circumstance at § 9711(d)(8)).  Stevens seems to suggests that all that should have been introduced was the mere stipulation that he been convicted of murdering Brenda Jo, and that the jury should have heard no more details about her injuries from Dr. Smith.  According to him, Dr. Smith's testimony was so prejudicial that its admission violated his due process rights and the Eighth Amendment's

---

[58]  Stevens repeatedly describes Dr. Smith's testimony as "unreliable and inaccurate."  He does not elaborate on this charge and there is nothing in the record to support this bald allegation.

mandate of heightened reliability in capital sentencing proceedings.  He also claims that his trial counsel were ineffective for failing to request a cautionary instruction to the jury concerning this evidence.

The Pennsylvania Supreme Court rejected Stevens' contention that Dr. Smith's testimony was "non-probative."  It held that his testimony regarding Brenda Jo's injuries "*was relevant both to explain to the jury the history and natural development of the case* and to prove the double murder aggravator [at § 9711(d)(11)]."  Stevens II, 739 A.2d at 530 (emphasis added).[59]  Its holding conformed with Pennsylvania capital-sentencing law, which provides that:

> *[A] capital sentencing hearing is not a sanitized procedure limited only to the evidence of aggravating circumstances.  The jury may evaluate the facts surrounding the murders.  This allows the jury to understand the nature of the offense and the defendant's character.*
>
> ...The Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt and, therefore, *it must be permitted to present any and all additional evidence that may aid the jury in understanding the history and natural development of the events and offenses for which a defendant is being sentenced, as well as those for which he has been convicted,* provided the evidentiary value of such evidence clearly outweighs the likelihood of inflaming the minds and passions of the jury.

Commonwealth v. Eichinger, 915 A.2d 1122, 1140-41 (Pa. 2007) (internal citations omitted, emphasis added) (citing Commonwealth v. Saranchak, 675 A.2d 268, 275 (Pa. 1996) and

---

[59]  In its opinion denying post-trial relief, the trial court noted that before it accepted Stevens' waiver of his right to a jury trial on his guilt, it warned the defense that, in the event Stevens was convicted and stipulated at a subsequent sentencing hearing as to the aggravating circumstance that he had been convicted of murder (§ 9711(d)(11)), the Commonwealth still would be permitted to introduce details about the murders.  (See Dkt. 15, App. 11, *Opinion Denying Post-Trial Motions* at 9-19).

Commonwealth v. Marshall, 643 A.2d 1070, 1075 (Pa. 1994)).[60]

I cannot, of course, re-examine the state court's evidentiary ruling.  See, e.g., Estelle, 502 U.S. at 67.  Stevens' attempt to overcome that ruling by arguing that the admission of the evidence violated his federal constitutional rights because it was non-probative and highly prejudicial gets him nowhere.  Dr. Smith's testimony was probative on the history and natural development of his case, and there is no basis for this Court to disturb the state court's conclusion that its relevance was outweighed its prejudicial effect.  Nor has Stevens shown that there is a reasonable probability that the outcome of his sentencing hearing would have been different had his counsel requested a curative instruction, let alone that the Pennsylvania Supreme Court's decision that he failed to establish ineffectiveness was "contrary to" or "an unreasonable application" of Strickland.

**Claim XIV     An Instruction On Parole Ineligibility**

In Simmons v. South Carolina, 512 U.S. 154 (1994) (which was decided after Stevens' sentencing hearing but before his judgment of sentence became final on direct review), the

---

[60] For example, in Eichinger, the defendant stipulated to having committed four murders at a non-jury guilt trial.  The Pennsylvania Supreme Court rejected his claim that the trial court erred in permitting the introduction at his sentencing hearing of all of his confessions and of autopsy testimony, concluding that the challenged evidence "aid[ed] the jury's appreciation of the events in question," and that the autopsy testimony was also "clearly admissible" as necessary to explain the history and natural development of the facts of the case.  Id. at 1141-42.  Similarly, in Marshall, the jury had been empaneled only for the capital sentence hearing, and the trial court had permitted the Commonwealth to introduce at that hearing graphic evidence of the victims' deaths.  The defendant challenged that ruling on appeal, and the Pennsylvania Supreme Court affirmed, holding that the admission of evidence concerning the condition of the victims' bodies was probative in that it assisted the jury in understand the history and natural development of the case and its relevance clearly outweighed any likelihood of inflaming the minds and passions of the jury.  Marshall, 643 A.2d at 1074-75.

defendant was convicted of first-degree murder in South Carolina state court and the jury had to

deliberate whether to sentence him to death or life in prison.  Under South Carolina law, he was

ineligible for parole if sentenced to life.  Id. at 157-58.  Nonetheless, at the penalty hearing the

prosecutor explicitly argued that the jury should impose a death sentence because the defendant

would be a future danger to society if sentenced to life.  Id. at 157.  The Supreme Court held that

under these circumstances, the Due Process Clause of the Fourteenth Amendment required that

the trial court instruct the jury that the defendant, if not sentenced to death, would receive a

sentence of life imprisonment without the possibility of parole.  Id. at 156-78.

In Claim XIV, Stevens asserts that his due process and Eighth Amendment rights were

violated by virtue of the trial court's failure to include a jury instruction that under Pennsylvania

law, life imprisonment means life without the possibility of parole.  He contends that his future

dangerousness was at issue in his penalty hearing, and that therefore the trial court's failure to

provide the jury with such an instruction violated the rule set forth in Simmons.  Stevens also

contends that Lipecky was ineffective for not raising a Simmons claim on direct appeal.

Stevens raised Claim XIV in the PCRA proceeding and the Pennsylvania Supreme Court

rejected it because state law prohibited it from giving Simmons retroactive effect on collateral

review when the defendant's penalty hearing occurred prior to the issuance of Simmons.  Stevens

II, 739 A.2d at 528 (citing Commonwealth v. Abu-Jamal, 720 A.2d 79, 120 (Pa. 1988)).

Stevens contends that since the Pennsylvania Supreme Court did not adjudicate his federal

constitutional claims on the merits, AEDPA's standard of review at 28 U.S.C. § 2254(d) does not

apply and this Court must review Claim XIV *de novo*.[61]  (Dkt. 29 at 17-18).[62]

I will assume without deciding that I may review Claim XIV *de novo*.  I will do so because this claim is premised upon Stevens' assertion that his future dangerousness was at issue at his sentencing hearing.  It was not.  See, e.g., Kindler, 542 F.3d at 89-90 (Simmons "is only applicable when the prosecution argues future dangerousness.... [because the defendant's] future dangerousness never became an issue here.... the rule in Simmons simply does not apply.")

In support of his contention that the Commonwealth put his future dangerousness at issue, Stevens relies upon one question that the prosecutor asked Dr. Martone on cross-examination, and one reference she made to Dr. Martone's testimony in her closing argument.  Specifically, on cross-examination, the prosecutor asked Dr. Martone – in the midst of a series of questions challenging her opinion regarding Stevens' medical condition and inquiring whether he had been able to conform his behavior to societal norms – "[t]o a reasonable degree of medical certainty in your expert opinion can you determine if he's dangerous?"  Dr. Martone responded that Stevens had posed a danger only to his estranged wife and the men he perceived to be involved with her,

---

[61]  The Commonwealth argues that federal review of this claim is barred under Teague v. Lane, 489 U.S. 288 (1989).  See O'Dell v. J.D. Netherland, 521 U.S. 151 (1997) (Simmons is a "new rule" under the Teague doctrine).  Under Teague, a state prisoner seeking habeas relief in federal court may not rely on a "new" constitutional rule of criminal procedure that was announced after the date his conviction became final.  489 U.S. at 310.  Because Stevens' direct appeal became final after Simmons was issued, Teague's federal retroactivity principle does not apply.

[62]  At the time of Stevens' sentencing hearing in April 1993, Simmons had not been decided and the law in Pennsylvania prohibited juries from being informed that "life means life without parole."  See Commonwealth v. Speight, 677 A.2d 317, 326 (Pa. 1996); Commonwealth v. Christy, 656 A.2d 877, 889 (Pa. 1995).  Accordingly, his trial counsel were not ineffective for failing to request a parole-ineligibility instruction or anticipating the change of law that occurred when Simmons was decided.

stating: "[i]n my opinion he would only be dangerous to certain people.  He is not somebody that

at random would hurt people."  (4/28/93 Tr. at 67).  The prosecutor referenced Dr. Martone's

testimony in that part of her closing argument in which she attacked the persuasiveness of

Stevens' mitigating evidence, not when she was discussing aggravating factors for the jury to

consider.  She argued that the evidence that Stevens had offered as mitigating was in actuality

just "excuses" for his intentional killings.  (Dkt. 31, App. 6, 4/29/93 Tr. at 8-22).  Towards the

end of this part of her argument, she summarized the testimony given by Dr. Martone,

Dr. Altman, and Dr. Landefeld and attempted to discredit their diagnoses, contending that "his

psychiatrists are just one more excuse."  (Id. at 22).  The prosecutor argued:

> The psychiatric testimony that he offers is interesting.  It is really interesting, more
> for what it says is right about him than for what it says is wrong about him.
>     Dr. Martone, let's take her first.  "Is he insane, Doctor?"  "No."  "Can you
> tell me, Doctor, to a reasonable degree of medical certainty in your expert opinion,
> does he know right from wrong?"  "Yes."  "Can you tell me, Doctor, in your
> expert opinion to a reasonable degree of medical certainty does he know the
> quality and nature of his acts?"  "Yes."  "Can you tell me, Doctor, is he mentally
> impaired?"  "No."  "Is there anything wrong with his brain?"
>     - - - "Doctor Martone, can he conform his behavior to normal social
> standards?"  "Yes."  "Is he competent to stand trial?"  "Yes."  What does that
> mean?  It means that when he walked in the bar on February 8th he had the mental
> ability to choose doing something other than what he did.  He can conform his
> behavior to normal social standards.  He can walk out the door.  "Doctor Martone,
> is he dangerous?"  "No, just to his spouse."  "Do you realize he shot a virtual
> stranger eight times?"  "Yes."  Interesting case of psychiatric testimony.  Doctor
> Martone's professional opinion is the perfect example of fact contradicting an
> opinion, perfect example.

(Id. at 19-20).

The Court of Appeals has emphasized that in reviewing the constitutionality of the

Commonwealth's conduct at sentencing, "[t]he relevant question is whether the prosecutors'

comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due

process.'"  Brian Thomas, 570 F.3d at 120 (quoting Darden v. Wainwright, 477 U.S. 168, 181

(1986), which was quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  It has further

instructed that in evaluating claims like those at issue here, the habeas court must not consider

the alleged improper argument and evidence in isolation.  Id. at 120-21.  Rather, they must be

considered in context to see if the Commonwealth urged the jury to consider future

dangerousness when contemplating the death penalty and created an unacceptable risk that the

jury believed, in error, that the defendant could be released on parole if he were not sentenced to

death.  Id.

   In this case, when considered in context, the prosecutor's question to Dr. Martone about

whether Stevens was dangerous, and her brief reference to Dr. Martone's response to that

question during closing argument, were made to show that Stevens' mental health mitigating

evidence was not credible and was contradicted by the actual circumstances surrounding the

murders.  The prosecutor did not argue that Stevens would be a danger to society if he was not

sentenced to death.  She emphasized that he *was able to conform his conduct to societal

standards*, but chose not to when he saw his estranged wife dance with another man.  Compare

Bronshtein v. Horn, 404 F.3d 700 (3d Cir. 2005) (were the prosecutor's emphasis in its closing

argument that the expert mental health evidence showed the defendant *could not conform* his

conduct to societal standards and that he was "prone to living a life of crime," made clear that the

prosecutor was suggesting to the jury that it should impose the death penalty because of the

defendant's inability to function in society in the future).

   In sum, the prosecutor's closing argument cannot be read to contain an encouragement to

the jury to consider the threat that Stevens would pose to others in the future if he was not

104

sentenced to death, or otherwise consider his future dangerousness as an aggravating

circumstance.  Nor did the evidence or prosecution argument create an unacceptable risk that the

jury believed that, if it did not impose the death penalty, Stevens could be released on parole.

Moreover, at no point did the trial court suggest to the jury that future dangerousness was

something that it could take into account when evaluating the sentences to be imposed.  Finally,

because there is no merit in Stevens' underlying claim that his due process or Eighth Amendment

rights were violated, counsel was not ineffective for failing to raise the issue on direct appeal.

See Thomas, 570 F.3d at 121.


## VI.    CONCLUSION

Based upon all of the foregoing, I deny Stevens' petition for writ of habeas corpus.

An appropriate Order follows.


                                        BY THE COURT:

Date: March, 29, 2010                   s/Arthur J. Schwab
                                        Arthur J. Schwab
                                        United States District Judge


cc: All counsel of record